183 So.2d 421 (1966)
GULF STATES UTILITIES COMPANY, Plaintiff-Appellee,
v.
Elise H. NORMAN et al., Defendants-Appellants.
No. 1613.
Court of Appeal of Louisiana, Third Circuit.
February 15, 1966.
Rehearing Denied March 9, 1966.
Writ Refused May 5, 1966.
*422 Milling, Saal, Saunders, Benson & Woodward, by Kennedy Gilly, J. B. Miller, and F. Frank Fontenot, New Orleans, Leon E. Roy, Jr., New Iberia, for defendants-appellants.
C. Thomas Bienvenu, Jr., St. Martinville, for absent defendants-appellants.
Bailey & Mouton, by W. C. Hollier, Lafayette, E. L. Guidry, Jr., St. Martinville, for plaintiff-appellee.
Before TATE, FRUGE, and CULPEPPER, JJ.
TATE, Judge.
Gulf States sues to expropriate a servitude for electricity transmission lines. The defendants are the co-owners in indivision of the 5,600-acre tract across which the servitude is sought. The defendant landowners appeal the trial award as inadequate.
The servitude area taken totals nearly 39 acres. The trial court based its award primarily upon the capitalized timber-income valuation of the property, estimated at $140 per acre, adding approximately $60 per acre for the value of the standing timber upon the tract. The trial award totalled $7,777.81.
Upon their appeal the defendants contend that the property taken is worth instead about $2,000 per acre, or in excess of $75,000. The appellants' chief contention *423 is that the trial court erroneously failed to consider as evidence of value four recent voluntary transactions by which pipeline servitudes were sold across the present or a neighboring tract at a per-acre valuation at least ten times greater than that awarded.
We think the defendants' contention is well-founded under the circumstances of this particular taking across this particular property, in the absence of better evidence as to the value of the property taken and as to severance damages caused by the taking. Because the taking, the property, and the evidence of value are each atypical in some respects, we will set them forth in detail before setting forth the reasons for our holding.
The Parent Tract
The defendants own a large continuous tract including some 5,600 acres, heavily wooded. The property is situated on the east side of the Atchafalaya River and has a river frontage of at least six miles. Although at its eastern rear and at its southern end the tract is low and subject to overflow, the great bulk of the tract is relatively high and well-drained, including the servitude area except at its rear extremity.
The northern boundary of the tract lies some 3½ to 4 miles south of U. S. Highway 190, which is a principal east-west traffic artery of this state. Parallel to and south of this highway is situated a main east-west line of the Missouri Pacific Railway. The parent tract is connected to the highway by an improved gravel road, which continues down the entire river-length of the property, next to the river levee. The defendants also own a 5,400-acre tract lying immediately north of the parent property, between it and the main highway and railroad.
The Servitude
The servitude strip taken by Gulf States is 9,959 feet, or 1.9 miles, in length. It is 170 feet in width, or more than half a city block wide. The total area included will be 38.87 acres. The servitude strip crosses the entire parent tract across its middle, from the western river frontage of the property across to the eastern boundary on Little Alabama Bayou.
The servitude strip lies approximately two miles south of the parent tract's northern boundary. For some six thousand feet of its east-west length the strip parallels the river frontage, the levee, and the access highway, all of which turn easterly in the area of the servitude to conform with a sharp bend of the river to the east at that point. The servitude is situated 550 feet north of the levee and the access road adjacent to it.
Upon this servitude, Gulf States plans to construct ten huge structures from 105 to 295 feet high, with crossarms 90 feet in width. These crossarms will support nine exposed and uninsulated cables for the purpose of transmitting electrical current of half-million-volt (500,000) strength. The conductor cables, from which high voltage sparks may jump a distance of seven feet or so, will sag between the tower-structures to a ground clearance of thirty-five feet.
When completed, voltage-wise this will be the largest electrical transmission line ever constructed in Louisiana, with only one other in the entire United States carrying as much voltage. The present line, for instance, will carry almost four times as much high-voltage as the next largest in the state.
Gulf States' Evidence of Value
Gulf States' evidence of value consisted of the testimony of three experts. Two realtors, basing their testimony upon five alleged comparable sales, arrived at an estimated value of $140 per acre or less. Another, a consulting forester and an expert *424 in the appraisal of timber lands, based his appraisal upon the ability of the tract to produce continuous crops of timber; he estimated the timber income realizable at $7 per acre, capitalized this at 5% to arrive at a value of $140 per acre for the land; he added that there was an additional value of $60 per acre for the standing timber. In arriving at its award, the trial court accepted essentially the testimony of this latter witness.
The sales relied upon by the former two experts are not shown by the evidence to be sales of comparable property. The appraisers selected the sales in question only because they concerned land included within the Atchafalaya Spillway. They had not inspected the allegedly comparable properties prior to the trial and so were unable to state whether the physical contours and conditions of the lands involved were indeed comparable. Additionally, great discrepancies in river frontage, road access, comparative acreages, sea-level, etc., were shown by the defendants' realtors to exist between the allegedly comparable lands and the subject tract. See Table I below. Gulf States' experts, in fact, frankly admitted that they could find no sales of more comparable property and merely accepted those selected as comparable in the absence of any better.

 TABLE I
 Comparables relied upon by the plaintiff company expropriating.
Comparable Date of Acreage Total Actual "Adjusted"* Distance
(Exhibit) Sale Price Price Price Per From Defs'
 Per Acre Land
 Acre
1 (P-5) Dec., 1960 331.4 $32,000 $96.56 ($115.87) 25 miles
 (does have (up river)
 river
 frontage)
2 (P-6) April, 1959 1,134.82 17,000 14.97 (19.09) 16 miles
 (and
 "other
 valuable
 consideration")
3 (P-7) April, 1959 480.00 24,000 50.00 (63.75) 14 miles
4 (P-8) March, 1959 320.00 16,000 50.00 (63.75) 13 miles
5 (P-9) August, 1957 8,431.00 250,000 29.65 (40.02) 16-24 miles
 (7 non-contiguous
 tracts included *Appraiser
 in more or
 this acreage; less arbitrarily
 only one very added
 small has some increment of 5% per
 river frontage.) year between date of
 comparable and
 date of present
 expropriation to
 allow for time
 differences.

*425 The third appraiser for Gulf States frankly admitted: "In South Louisiana it [a large tract of timber land] just doesn't change hands that often. It may be thirty or forty years to find comparables. I mean, between sales. And for that reason, it is difficult to use comparables. And again, when you consider comparables, you have to estimate the timber on the individual tracts to know how they compare. And for that reason, I base my appraisal on the ability of this individual tract to produce continuous crops of timber." Tr. 473. The expert therefore based the market value of the property taken upon its capitalized valuation, which was accepted by the trial court as the most reliable evidence of market value in testimony.
This approach to valuation has much to commend it under the present circumstances. In the absence of any better evidence of value by the use of comparable sales, the use of capitalized-value has indeed been accepted as a means to determine the market value for purposes of an expropriation award. See Orleans Parish School Board v. Paternostro, 236 La. 223, 233, 107 So.2d 451.
The Defendant Landowners' Evidence of Value
Nevertheless, the defendants-appellants contend that a better guide to market value of the servitude taken is furnished by certain allegedly comparable salesfour sales of servitudes in the vicinity, so that resort to the capitalization method of valuations is unrealistic and incorrect under the circumstances.
In support of this contention, the defendant landowners introduced the testimony of two expert realtors. They testified that, except for certain pipeline servitudes to be referred to below, they found no comparable sales involving similar property, as there had not been any sales out of large tracts in the area within recent years, whether of river frontage or otherwise. These experts also stated specific reasons why the comparables relied upon by the plaintiff's realtors did not involve similar property. Based upon their own inspection of both the strip to be taken and of certain nearby pipeline servitude strips recently sold, both of these experts found that the most comparable sales they could find were the four pipeline-servitude transactions in question. Based upon the consideration paid for these acquisitions, the realtors found the property presently taken to have a value of between $1,975-$2,000 per acre.
These realtors both felt that the highest and best use of the land taken was for future industrial sites because of its unusually well-favored location, but that in any event its present market value was in the area of two thousand dollars per acre. The realtors stated that the greater per acre value of the property taken, as compared with good farmland for instance, was due to the land's potential for development as a prime industrial site due to its deep-water frontage with depth, the unusually high batture between the levee and the river at the point, the ready access to major highway and rail service, and the availability of mineral production in the surrounding area. Both realtors pointed out that Anchor Gasoline had built a million dollar industrial plant within the immediate vicinity of the tract. One of the realtors testified that in his opinion there was a ready market for at least three to four hundred acres of the property for industrial purposes at the present time.
Both realtors and also an electrical engineering expert pointed out that the particular location of the present high-voltage line, paralleling over a mile of the property's best potential-industrial frontage at a distance of only 550 feet behind the levee, had the effect of constituting a barrier to future development of the land along this prime stretch of river frontage.
*426 The deeds upon which the defendants' expert realtors relied are shown in Table II below. We will discuss the transactions in more detail after we have set forth the legal principles we deem to be applicable.

 TABLE II
 Comparables relied upon by the defendant landowner.
 Actual
 Price
 Per Purchaser
 Date Total Acre had
Comparable of Length Width Total Total (to Power to
(Purchaser) Sale (in feet) (feet) Acres Price Dollar) Expropriate?
A (Cockrell) Oct. 35,296 25 20-25 $40,000 $1,975 NO
 1961
B (Dixie August 7,161 30 4.93 7,192 1,458 YES
 Pipeline) 1961
C (Anchor July 12,865 20-30 7.70 11,000 1,298 NO
 Gasoline) 1961
D (Colonial Feb. 1,499 30 1.03 3,230 3,135 YES
 Pipeline) 1963

Legal Principles Applicable
Under Article I, Section 2, of our State Constitution, private property cannot be taken or damaged unless "just and adequate compensation is paid."
In determining just and adequate compensation for expropriation suits, it is usually said that the award should be based upon the market value of the property taken: the price which would be agreed upon between a willing buyer and a willing seller, see State Through Dept. of Highways v. Hayward, 243 La. 1036, 150 So.2d 6 and cases therein cited; that is, the worth of the property in the light of the highest and best use to which the property is adaptable and to which it may reasonably be put in the not too distant future, State Through Dept. of Highways v. Rapier, 246 La. 150, 164 So.2d 280. Additionally, of course, the landowner is entitled to any severance damages sustained by the remainder of the property, being the difference between the market value of the remainder just before and immediately after the taking. State v. Lancon, La.App. 3 Cir., 174 So.2d 257.
The Louisiana jurisprudence is uniform in holding that the best criterion of the value of the property taken is evidence as to the price paid in comparable sales, i. e., recent sales of similar property in the vicinity; for such sales usually more accurately indicate the willing seller-willing buyer value than a figure derived by other more theoretical approaches. State Through Dept. of Highways v. Central Realty Inv. Co., 238 La. 965, 117 So.2d 261, and cases therein cited; Comment, 18 La.L. Rev. 509, 540 et seq. (1958). Indeed, there are expressions in the jurisprudence that other approaches to valuation should be disregarded as less reliable whenever comparable sales are available as a basis of value. See, e. g., State Through Dept. of Highways v. Bjorkgren, La.App. 1 Cir., 147 So.2d 905, 909.
The basic purpose in all cases, however, is to determine the just and adequate *427 compensation required by our constitution. Whatever approach or formula of valuation used, it should take into consideration "all factors which lead to a replacement of the loss caused by the taking. This means substantially that the owner is placed in as good a position pecuniarily as he would have been had his property not been taken. [Many citations omitted.]" State Through Dept. of Highways v. Ragusa, 234 La. 51, 99 So.2d 20, 21. See also State Through Dept. of Highways v. Barrow, 238 La. 887, 116 So.2d 703; State v. Poulan, La.App. 2 Cir., 160 So.2d 387; United Gas Pipe Line Co. v. Nezat, La.App. 3 Cir., 160 So. 2d 367; State Through Dept. of Highways v. Gras, La.App. 2 Cir., 131 So.2d 628.
In Louisiana (unlike in many jurisdictions, Annotation, 85 A.L.R.2d 112 at 163, Section 10), a sale to an expropriating authority may be considered in reaching an opinion as to the value of other property taken; although such sale is not controlling, since being made under threat of expropriation it is not a willing seller transaction. State Through Dept. of Highways v. McDuffie, 240 La. 378, 123 So.2d 93; Orleans Parish School Board v. Paternostro, 236 La. 223, 107 So.2d 451; State v. Sauls, 234 La. 241, 99 So.2d 97; State v. Dowling, 205 La. 1061, 18 So.2d 616; State Through Dept. of Highways v. Dodge, La.App. 3 Cir., 168 So.2d 430; State Through Dept. of Highways v. Cannon, La.App. 1 Cir., 159 So.2d 49; State Through Dept of Highways v. Caillier, La.App. 3 Cir., 157 So.2d 274; United Gas Pipe Line Co. v. Nezat, La.App. 3 Cir., 136 So.2d 76; State Through Dept. of Highways v. Carret, La.App. 3 Cir., 130 So.2d 447; State Through Dept. of Highways v. Bourque, La.App. 3 Cir., 127 So.2d 784.
In our opinion, our trial brother fell into error in failing to apply the last-cited principle, namely, that voluntary sales of servitudes to expropriating authorities may be considered as evidence of value, even though they are not controlling.
The Trial Award in the Present Case
The trial court found that the highest and best present use of the tract taken to be for timberland. Accordingly, it based its award principally upon a theoretical value of the land derived by capitalizing the estimated timber income. This was done because essentially it found no comparable sales upon which to arrive at market value (if the other sales of servitudes are disregarded).
The defendant landowners' appraisers had testified to a value of approximately $2,000 per acre, based chiefly upon the prices per acre paid in recent sales of pipeline servitudes across the present or an adjacent tract, there being no other comparable sales. The evidence without contradiction indicates that the prices paid for these servitudes (see Table II above) were arrived at by free bargaining between the landowners and the pipeline-constructors in question. In explaining why the parties to the transactions may have been willing respectively to agree upon so high a value for the land, the appraisers stated that it was probably because of the parent tract's potential future industrial development.
In disregarding the evidence as to value of these experts, the trial court accepted the plaintiff's view that the determination of value depended simply upon whether the property was just average Atchafalaya Basin swamp and timberland or whether it was instead industrial or potentially industrial in nature. Finding that the evidence does not show that there is either a present or a presently foreseeable demand for the purchase of this property for industrial use, the trial court accorded no weight to the value of $2,000 per acre arrived at by the landowners' experts based upon the comparable sales of pipeline servitudes.
With great respect for the trial court, we have nevertheless concluded that it erred in ignoring evidence of value based upon the pipeline sales in the record. They are *428 the only recent sales of comparable property used by any of the experts in estimating the value of the property taken. As previously noted, comparable sales are deemed to be the best guide to the market value of property expropriated, and in this connection sales to expropriating authorities may be considered. The defendants' appraisers' opinion as to value was essentially based upon these pipeline servitude sales, the only comparable sales in the record. It was error to fail to accord any weight whatsoever to their evidence by accepting Gulf States' argument that the prices actually paid for these servitude sales were unrealistic on Gulf States' assumption that the land could not have any more value than as average timberland.
That is, Gulf States argues, based upon present use, that the expropriated tract is only average timberland and thus has a value of only $140 per acre. If the evidence shows that substantially more (in fact, averaging $2,000 per acre) has been paid for comparable servitudes under good-faith willing-buyer-seller transactions, this evidence is a more reliable guide to market value than any theoretical price of average timberland. If in sales of comparable property a greater price than for average timberland is in fact paid, this reasonably indicates that the present tract has a greater market value than as average timberland; for market value is best determined by what willing buyers and sellers will actually pay and accept for property, not by theoretical assumptions of what the price should be.
By Gulf States' approach, requiring an assumption that the property taken is just average woodland, the amount to be awarded is determined just as if the area taken were located far away from the river frontage, with value dependent solely upon the timber income it might produce. In fact, however, willing buyers paid for the land on a different and more valued basis (as the pipeline servitude transactions indicate), and the evidence as a whole indicates a far greater intrinsic value to the property than as interior woodland because of its most favored location and its potential for future development.
The constitution requires that just and adequate compensation be paid landowners whose property is taken. As the jurisprudence holds, this means essentially that the landowner be placed in as good a position pecuniarily as he would have been had his property not been taken. The constitutional requirement is ignored if we restrict the landowner's compensation to some theoretical price of average woodland, when the evidence shows that the particular property taken, regardless of its present or immediately foreseeable use, has in fact a far greater value.
We conclude, therefore, that it was error to disregard the defendant landowners' experts' testimony as to value under the circumstances of this case.
The Market Value of the Tract Expropriated, Taking Into Consideration the Pipeline Servitude Sales
The defendant landowners' experts valued the 39-acre servitude at $1,975-$2,000 per acre, based upon the prices paid in what they felt were the only recent comparable sales. These were sales of pipeline servitudes. See Table II above. Under the jurisprudence earlier cited, these may be considered (if truly comparable) and to the extent they are the result of good faith bargaining; but they are not controlling, since to some extent the price paid may be inflated by the necessity of the purchase or else decreased by the threat of compulsion.
We have examined the circumstances of the transactions, find they concern comparable properties and result from good-faith bargaining, and have determined that the sales are of probative force in the determination of the value of the property taken.
*429 The evidence of the landowners' land-management administrator and of the purchasers of the pipeline servitudes indicate that the prices were arrived at by arms-length bargaining. Two of the purchasers had the power to expropriate, but voluntarily paid the price in question. In the negotiations, the landowners' representative took pains to preserve the property's integrity for its industrial potential by proposing and having accepted alternative routes away from frontage or the interior of the property where possible, and with a relocation clause in at least one agreement.
Of the four comparables (see Table II), Comparables A and B were located on the tract of defendants across which the present servitude is taken. Comparables C and D are pipeline servitudes sold across the 5,400-acre tract owned by defendants immediately north of the present land, the northerly property being a large tract of river frontage land having generally the same value and potential as the present parent tract.
Comparable B runs across the entire parent tract parallel to and about 1½ miles south of Gulf States' servitude strip, at a place where the tract is somewhat narrower. It is comparable in length to Gulf States'; its lesser acreage is due to the servitude being far narrower. This C servitude is on somewhat lower land and runs perpendicular to the river levee which runs north-south at the point (rather than parallel to it as does Gulf States' strip, which is where the river bends eastward). Hence, B does not tend to fence out development of river frontage along its entire length as does the subject servitude. Gulf States contends that the average price of $1,458 per acre for B was based upon a compelling need for immediate construction of the pipeline, but the evidence also reflects that the grantee had the power of expropriation and filed at least twelve suits; it also reflects that the grantee paid only $35-$55 per acre for similar servitudes on less favored property just across the Atchafalaya, which to some extent corroborates the defendants' position that there was actual bargaining based upon the value of the properties in question. The price paid includes not only the 30-foot servitude but also timber damage during construction on a strip 100 feet wide.
Comparable A was granted down the entire eastern rear of the parent tract. It is 3½ times as long as the subject servitude; its lesser areage is because it is more narrow. It is situated generally in lower or marshy ground. Gulf States argues that the price of $1,975 per acre paid for this longer and narrower servitude represents a price the purchaser had to pay, since the purchaser did not have the power to expropriate. The grantee's agent testified that there was no urgent need for immediate construction, although there were good business reasons to build the pipeline; and that the route was selected over alternates available which had a greater number of ownerships and less favorable terrain.
Comparable C was upon high ground similar to the subject servitude's location. Gulf States argues that the price of $1,298 per acre resulted from a monopoly situation, since the grantee did not have the power to expropriate and the only route available was across the defendants' land. The president of the grantee corporation testified that his company had set its own valuation and that he considered the lands in question to be ideally situated for industrial sites because of a deep water channel with public highway access.
Comparable D was situated on lower ground, subject to flooding, and was about one-fifth as long and much narrower than the subject servitude. The price paid was $3,135 per acre, which Gulf States argues is unrealistic and represents a subjective value to the taker.
In summary, the evidence indicates that the pipeline servitude transactions in *430 question were across comparable property and that the prices arrived at were the result of free bargaining, influenced however to some extent by the need of the grantees to acquire such servitudes. In our opinion, they should therefore be considered in determining the market value of the land in question: each of them was the product of arms-length bargaining, and in cumulation they represent a series of transactions with different purchasers. They thus reflect a general market situation indicating that willing buyers in fact regarded property comparable to the subject tract as having a greater market value than as average timberland. Likewise indicative of such value, we feel, is the circumstance that to some extent the prices for the servitudes were influenced by the large area of the parent tract, its particular location on higher ground or near an industrial site, or other favorable characteristics of the property.
We do not find to be persuasive Gulf States' contentions (a) that the property is low and subject to periodic flooding and overflow and (b) that a flowage easement owned by the federal government has the effect of making the property worthless for future development.
As to the former or (a) contention, the expert testimony does indicate that approximately ten per cent of the servitude area, mostly at the rear eastern end along Little Alabama Bayou, was subject to overflow; however, we do not find persuasive the expert's estimates that a greater portion was actually subject to overflow, which were only based upon estimates of tree-marks of unknown age and upon undated recollections of a decade or so earlier, for these suppositions are contradicted by positive evidence that the land was high and not subject to overflow for most of the length of the servitude, as corroborated to some extent by contour maps. As to the latter or (b) contention, the defendants' experts testified that, because the federal government has never exercised this easement in the twenty-five years of its existence, it has little effect on market value, as witness the homes and businesses built within the floodway, and as instanced by the Anchor Gasoline industrial plant built within a mile or so of the parent tract. (The president of that corporation testified, for instance, that this one million dollar plant was built at its site with full knowledge of the easement and of the federal government's right to flood the area in emergencies.)
We therefore find that the factors in question do not indicate that the property should be valued merely as overflow land, when the evidence as a whole, including that based upon comparable sales, indicates otherwise.
In accord with the jurisprudence, this court has in similar circumstances, especially in the absence of more reliable comparable transactions, approved the use as comparable sales of conveyances to expropriating authorities as an aid to determine the actual market value of property taken. State Through Dept. of Highways v. Caillier, La.App., 157 So.2d 274; State Through Dept. of Highways v. Carret, La.App., 130 So.2d 448; State Through Dept. of Highways v. Bourque, La.App., 127 So.2d 784; see also: City of New Orleans v. Thieler, La.App. 4 Cir., 181 So.2d 56. We see no reason why we should not do so here. See also Louisiana Ry. & Navigation Co. v. Morere, 116 La. 997, 41 So. 236, and United Gas Pipe Line Co. v. Nezat, La.App. 3 Cir., 136 So.2d 76, where cases were remanded to consider evidence founded upon sales of rights of way to other expropriating authorities, held to be improperly excluded.
Gulf States' very able counsel does contend that the prices paid for the pipeline servitudes represent their special value or adaptability for the use of the purchasers and should therefore not be considered, relying upon Gulf States Utilities Co. v. Wyatt, La.App. 3 Cir., 164 So.2d 615. This decision, however, concerned an isolated *431 transaction which we held could not be considered as indicative of market value. Here, on the contrary, a series of transactions indicate a general market value of the property rather than merely a special value to a particular taker in a single transaction. Other cases cited to the same effect are likewise distinguishable.
We have therefore determined that the testimony of the landowners' experts should be considered in determining the value of the property expropriated. Nevertheless, their opinion as to value is not controlling, insofar as to some extent the comparable sales relied upon by them result from special needs or circumstances as shown above. We will take into consideration other evidence as to marketability and value offered by the plaintiff's appraisers.
Viewing the record as a whole, and considering not only the burdensome location of the servitude but also that some parts of the strip taken are less valuable than others, we think that the fair market value of the property taken is $500 per acre, including timber damage.[1] We will accordingly amend the judgment so as to compensate the landowners at this rate for the 38.87 acres taken.
Decree
Accordingly, the award of the trial court is amended by increasing it to a total of Nineteen Thousand Four Hundred Thirtyfive Dollars ($19,435.00), together with interest and costs; as thus amended, the judgment is affirmed in all other respects.
Amended and affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.
Hood, J., is of the opinion that a rehearing should be granted.
NOTES
[1] The entire court has studied the record. A majority of the entire court favors increasing the award; however, although some of the majority feels a greater increase to be justified by the record, the amount allowed is the maximum upon which a majority agrees.