720 So.2d 460 (1998)
Philip S. SCURRIA, Sr., et al., Plaintiffs-appellants,
v.
Billy Charles H. HODGE, et al., Defendants-appellees.
Nos. 31207-CA, 31208-CA.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1998.
Rehearing Denied December 3, 1998.
*461 Bruscato, Tramontana & Wolleson by Anthony J. Bruscato, Monroe, for Appellants.
Lavelle Salomon, J. Edward Patton, Monroe, for Appellees Billy C. Hodge, Joseph S. Scurria and Tallulah Cablevision Corporation.
Hayes, Harkey, Smith & Cascio by Joseph Cascio, Jr., Monroe, for Appellee Harry G. Frazer, Jr.
Before MARVIN, C.J., and HIGHTOWER and CARAWAY, JJ.
CARAWAY, Judge.
In this action for breach of fiduciary duties, the two defendants acquired stock in a closely held corporation from the succession of Anthony Scurria. One of the defendants was a co-administrator of the succession and both were officers and directors of the corporation. Finding that the price received by the succession was far below the market value of the stock, we determine that the defendants/ fiduciaries breached their duties to the succession and reverse the ruling of the trial court which had dismissed the succession's claims.

Facts
Anthony Scurria ("Anthony") died on December 16, 1983. His eight heirs included his brothers, sisters and a niece. In January 1984, Joe Scurria ("Joe") and Sam Scurria, two of Anthony's brothers, were named co-administrators of the Succession of Anthony S. Scurria. LeRoy Smith, Jr., an attorney, was retained to represent the succession, and he subsequently hired Harry G. Frazer, Jr., a CPA, to value the assets for estate tax purposes.
In 1979 prior to Anthony's death, Anthony, Joe and their nephew, Billy Hodge ("Hodge"), had formed Tallulah Cablevision Corporation ("TCC"). One hundred fifty shares of stock were issued, with the shares being divided equally between the three shareholders. TCC borrowed $150,000 from a bank with all three shareholders signing the loan, and each shareholder additionally advanced $70,000 to the corporation. In the organizational minutes of TCC, Anthony, who became president, was authorized to execute promissory notes to each shareholder for his $70,000 loan to TCC. The $70,000 debt to Anthony remained outstanding at his death, although no promissory note was produced at trial and there was no evidence as to the note's terms. In 1980, Anthony further loaned additional funds to the corporation, and TCC was paying monthly installments on this loan which totaled approximately $27,500 at Anthony's death.
On February 27, 1984, at the first documented shareholders' meeting since TCC's *462 formation, Joe and Hodge were elected directors of the corporation, the articles of incorporation were amended to restrict the shareholders' right to sell stock to third parties and the bylaws were amended to provide that the board of directors could take action on behalf of the corporation. Previously, corporate action could only be taken upon unanimous consent of the shareholders. At the shareholders' meeting, Joe acted as administrator in voting the shares of the succession.
One of the purposes stated in the notice of the February 1984 shareholders' meeting was to authorize the listing of the corporation for sale with a broker. On that same date, Joe and Hodge signed a brokerage agreement on behalf of TCC authorizing Mid-South Media Brokerage, Inc. to market TCC for the price of $3,000,000. No deal was consummated during the term of the brokerage agreement, and the broker contract was eventually terminated.
Frazer, who had been the accountant for TCC, testified at trial that he had no particular knowledge or experience in valuing cablevision systems. In his calculations, Frazer used the estate tax guidelines provided by a federal revenue ruling. Using a capitalization of cash flow formula, he determined that Anthony's stock in TCC was worth $229,500, discounted by 15% as a minority interest, to $195,050. Frazer conveyed his opinion directly to Leroy Smith in a letter dated July 19,1984.
As the succession proceeding progressed, there was a need for cash to pay state and federal estate taxes. There was testimony that each of the eight heirs would have to pay between $17,000 and $18,000 to liquidate the succession debts and pay the required taxes if another method of generating income such as selling the stock or land or borrowing money was not agreeable. Joe and Hodge, the two remaining original shareholders of TCC, offered to purchase the estate's interest in TCC for $100,000.
A Petition for Authority to Sell was filed with the court on August 8,1984 to allow the estate to sell its interest in TCC to Joe and Hodge. However, on August 24, 1984, Leo Miller representing Sam Scurria, individually and in his capacity as co-administrator of the succession, Annie Scurria Lombardo and Philip S. Scurria ("Philip") filed an opposition to the petition. In September 1984, a meeting of all interested persons was held to discuss the value of the TCC stock. Ultimately, the opposition to the sale was withdrawn and having no opposition, the court signed an order in September 1984 granting authority to sell the estate's one-third share of the stock in TCC to Joe and Hodge for $100,000. Joe and Hodge also caused the two debts owed by TCC to the Succession of Anthony Scurria in the sum of $91,000 to be paid.[1]
After purchasing the estate's interest, Joe and Hodge listed TCC for sale in January 1985 for $2.3 million with another broker, Cable Properties, Inc. Around May 30, 1985, the assets of TCC were sold to Tallulah Cable TV, Inc. for $1.9 million with $1 million paid at closing and $900,000 plus applicable interest, payable in installments over a period of years.
On May 29, 1986, Philip, individually, filed suit against Joe and Hodge alleging that, as officers and majority shareholders of TCC, they violated their fiduciary duties owed to him and that Joe violated his fiduciary duties as co-administrator of the estate. Claims of misrepresentation and fraud were also alleged. On September 11, 1989, Philip filed a petition to re-open the succession and for appointment as provisional administrator in the Succession of Anthony S. Scurria. Upon the granting of the reopening of the succession and his appointment, Philip, as provisional administrator, filed a petition for damages against Joe, Hodge and TCC alleging the same basic claims as those in his individual suit. Later, Philip amended the consolidated actions to join Frazer as an additional defendant, alleging that Frazer committed professional negligence in valuing the stock.
*463 Following completion of plaintiffs' presentation of evidence, all defendants moved the court for an involuntary dismissal. The trial court granted Frazer's motion holding that there was insufficient evidence to prove Frazer was guilty of malpractice. This dismissal was affirmed by this court and the judgment is now final. Further, the trial court ruled that the evidence presented did not prove any intentional fraudulent misrepresentations made by Joe and Hodge and dismissed the claims for fraud. Following the presentation of the defense regarding the remaining issue, the trial court found there had not been a breach of fiduciary duties by Joe or Hodge and dismissed the suit.

Ruling of the Trial Court
In the very thorough written opinion of the trial court, the court gave a telling description of the tension existing among the family members during the administration of Anthony's succession. The court said:
The court has not ignored and thus acknowledges a history of distrust in the Scurria family. The successions of the parents of Anthony Scurria and his siblings had apparently been under administration for many years. According to the testimony the actions of Philip in the succession of the father were brought into question in litigation. These feelings of distrust and resentment carried over into the Succession of Anthony Scurria. Discussions at family meetings were often contentious and became heated at times. It is the opinion of the court that these old feelings of resentment and mistrust were among the principal reasons that constructive discussions broke down and the co-administrator, Sam S. Scurria, Jr., his brother Philip and sister Angelina got tired of the discussion and agreed to the sale of the one-third (1/3) interest in TCC knowing that the stock was potentially worth much more.
In the trial court's review of the case, the court focused much attention on the knowledge of Joe and Hodge regarding TCC's value in comparison to the knowledge of Philip and other heirs. Although the court had previously found at the conclusion of the plaintiff's case that no fraud or misrepresentations had been shown on the part of Joe and Hodge, the court's later analysis of the fiduciary issue also dealt extensively with miscommunication issues, such as the validity of claims regarding Joe's discussions with other heirs of his belief in the $3,000,000 value of the corporation and the plaintiff's claim that a $2.4 million dollar offer for TCC had been received by Mid-South Media Brokerage, Inc. but ignored by Joe and Hodge prior to the sale of the succession's interest. The trial court found that Sam Scurria, the co-administrator, knew the one-third interest in TCC was worth more than $100,000 and that Philip had more knowledge in valuing TCC than any other heir. In this comparison of the knowledge of the parties' relative to the proposed sale of the succession's interest in TCC, the trial court concluded:
The listing for three million dollars was discussed by the heirs in efforts to close the succession. The evidence demonstrated that Billy Hodge was a farmer who could not read. Joseph Scurria had a college degree in science but had returned home after college to assist his father in running a grocery store and operating a farm. Neither Hodge or Scurria impressed the court as a shrewd or unethical business operator. Joseph Scurria and Hodge had no assurance that TCC would sell or what the sale price may be when they purchased the one-third interest of Anthony.
Finally, the trial court ruled that the evidence showed "that the sale even though not a pleasant event was an arms length transaction." (Emphasis added) The unpleasant event to which the court alluded concerned the formal opposition filed by Sam, Philip and Annie and the resulting family meeting where the opposition parties finally "got tired of the discussion" regarding the value of TCC, withdrew their opposition and agreed to the sale.

Applicable Law
A succession representative has fiduciary duties under Louisiana law. La. C.C.P. art. 3191 provides that: "A succession representative is a fiduciary with respect to the succession, *464 and shall have the duty of collecting, preserving, and managing the property of the succession in accordance with law. He shall act at all times as a prudent administrator, and shall be personally responsible for all damages resulting from his failure so to act."
In discussing fiduciary duties in the analogous context of a partnership, our court has stated as follows:
The relationship of partners is fiduciary and imposes upon them the obligation of the utmost good faith and fairness in their dealings with one another with respect to partnership affairs. Each partner must refrain from taking any advantage of another partner by the slightest misrepresentation or concealment of material facts. The obligation is especially stringent on a partner who is managing the business, his duty being analogous to that of a trustee. The fiduciary duty of the partners is particularly applicable when one partner seeks to purchase the interest of another partner. Such a sale will be sustained only when it is made in good faith, for a fair consideration, and on a full and complete disclosure of all important information as to value. This duty of disclosure holds true despite the fact that the relations between the partners have become strained or in conflict.
W.A. McMichael Const. Co. v. D & W Properties, Inc., 356 So.2d 1115, 1122 (La.App. 2d Cir.1978), writ denied, 359 So.2d 198 (La. 1978), emphasis added.
As a prudent administrator, the succession representative has the duty to obtain "the best price reasonably obtainable" in a sale of a succession asset. Succession of Taglialavore, 500 So.2d 393, 396 (La.1987). See also, Goldblum v. Boyd, 341 So.2d 436 (La.App. 2d Cir.1976). It is axiomatic that if an administrator is uninformed about an asset's value at the time it is sold, he cannot be acting as a prudent administrator because he does not know if he is obtaining the fair market value. Cf. Succession of Irving, 436 So.2d 1263 (La.App. 1st Cir.1983), writ denied, 442 So.2d 452 (La.1983).
Similar to a succession representative's fiduciary obligations, officers and directors also have special duties to the corporation's shareholders. La. R.S. 12:91 states, in pertinent part, "Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions."
In a significant case by the United States Fifth Circuit Court of Appeal which summarized the Louisiana jurisprudence at that time, the court dealt with a situation where the officers/majority shareholders of a closely held corporation bought out the minority shareholders for a per share value which was greatly below the value which was indicated by all the available information within the officers' knowledge. Mansfield Hardwood Lumber Co. v. Johnson, 263 F.2d 748 (U.S.Ct.App. 5th Cir.1959), petition denied, 268 F.2d 317 (U.S.Ct.App. 5th Cir.1959). After finding that "the necessary mens rea for... actionable fraud" was not adequately established by the evidence, the court nevertheless held the officers accountable for the huge profit they made at the expense of the minority shareholders based upon the fiduciary duty of corporate officers, which the court discussed as follows:
* * * Whether this relationship between officers and directors and their stockholders is termed fiduciary or quasi-fiduciary or trust or confidence is immaterial, and, likewise, it is immaterial whether its breach is described as constructive fraud, unjust enrichment, fraudulent breach of trust, breach of fiduciary obligation, gross negligence, or otherwise, and whether the remedy is given by a constructive trust, restitution, or accounting. These are all relative terms describing broad equitable concepts. The standard of a fiduciary's duty to his beneficiary, depending upon the instant relation and the facts of the particular case, lies somewhere between simple negligence and willful misconduct or fraud with the intent to deceive. The actual intent to deceive is not required where one *465 party is so placed in such an advantageous position to the other.
Id. at 754.
The Louisiana Supreme Court, interpreting La. R.S. 12:91, has held that persons with a fiduciary duty "may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights" of the person or entity to which they owe that duty. Noe v. Roussel, 310 So.2d 806 (La.1975). The fiduciary's dealings are subject to rigorous scrutiny. The court concluded that, "an agent who acquires his principal's property, or one who otherwise acts in a fiduciary capacity, bears the burden of establishing that the transaction was an arm's length affair." Id. at 818-819.

Discussion
Based upon the above legal authorities, the sale of TCC's stock to an administrator of the succession and to officers of the corporation carried on its face a presumptive or constructive fraud. Noe, supra. Thus, even in the absence of any wilful misrepresentation or actual fraud which was the emphasis in the trial court's ruling, a stringent burden of proof was placed upon Joe and Hodge to overcome an appearance of self-dealing to the possible detriment of the succession. The burden of proof required a showing by defendants that the transaction was an arms-length sale. Also, regarding Joe's duties as a representative of the succession, he must demonstrate that he acted as a prudent administrator in making the proposal for the sale. La. C.C.P. art. 3191.
The requirement for an arms-length transaction is the equivalent of a showing of market value.[2] The product of arms-length negotiations between informed and willing buyers and sellers is a market value price because both sides have sufficient knowledge and understanding of the value of the object in the market. See for example, Succession of Boyd v. Adams, 275 So.2d 441 (La.App. 2d Cir.1973) and Gulf States Utilities Co. v. Norman, 183 So.2d 421 (La.App. 3d Cir. 1966), writ refused, 185 So.2d 529 (La.1966), where the courts discuss market value in terms of arms-length bargaining. When a fiduciary proposes to sell property in his trust to himself, the normal arms-length relationship between a competing buyer and a competing seller is missing, and the appearance that a fair price will be obtained is also absent, undermining the trust relationship. The fiduciary must therefore show that the price he pays is the fair market value.
Additionally, a succession representative charged to act as a "prudent administrator" is required to obtain knowledge of the value of the assets of the succession for various purposes. Particularly, upon the necessity of a sale of succession property for administrative purposes, a prudent administrator must know the market value of the asset to be sold.
Despite the trial court's assessment in this case regarding the lack of a devious, shrewd or manipulative motive on the part of Joe and Hodge, the court nevertheless concluded that they "had no assurance ... what the sale price may be when they purchased the one-third interest of Anthony." As fiduciaries who are responsible for initiating a sale to themselves, Joe and Hodge were under a duty to know what the sale price or market value of the stock was and to be able to justify it in September 1984 and at trial. They could not make a "full and complete disclosure of all important information as to value" (W.A. McMichael Const. Co., supra.) because they had neglected to find out.
The best evidence concerning the value of TCC, as indicated by the pricing methodologies within the industry, came from the testimony of three cable company brokers. Charles Grimes of Mid-South Media Brokerage, Inc. testified at trial that during the time period in 1984 when Joe and Hodge listed TCC with his company, cable businesses *466 were selling at prices ranging from $800 to $1,000 per subscriber. Given that Joe and Hodge had informed Grimes in early 1984 that TCC had between 2,200 and 2,400 subscribers, this would yield a price range of $1,760,000 to $2,400,000. Nevertheless, by their actions as directors of TCC in February 1984, they listed the corporation for sale with Grimes at $3,000,000.
The depositions of both William J. Dugan, Jr., a broker who met with Joe and Hodge but did not secure a brokerage agreement, and Edward Thorn, the broker who eventually sold TCC, were admitted into evidence at the trial. Dugan and Thorn both stated that in addition to the amount per subscriber methodology, another accepted means for determining the selling price of a cable company during this time period was to take fifty percent of the annual gross revenues of the business times a multiple of eight or nine.[3] The financial statements of TCC show that for the nine month period ending September 30, 1984, TCC's annual gross revenue was $325,488.83. Annualized, this amount would yield a gross revenue of $435,985.11.[4] After applying the formula and depending on whether a multiple of eight or nine is used, this method produces an estimated selling price range of $1,735,940 to $1,952,933.
Both of these pricing methodologies are borne out by the actual selling price of TCC for $1,900,000 in the spring of 1985, a price which falls squarely within the values predicted by these three brokers. From this testimony, we find that Joe and Hodge breached their fiduciary duties in September 1984 in failing to determine an arms-length sales price or fair market value for TCC upon which to base their price for the purchase of the succession's interest.
We are not persuaded by the argument that the exigencies of the moment in September 1984, with pressing deadlines for estate taxes, excuse the fiduciaries from their duties. Likewise, the heirs' knowledge and views about TCC expressed at the contentious family meeting described by the trial court did not negate the fiduciaries' duty to present an accurate disclosure of TCC's value based upon objective information gained from experts such as the three brokers who testified. With this rather unique asset whose market value was somewhat beyond the understanding of the local CPA and the heirs, the resentment and distrust existing among the parties must be cut through with a detailed and objective appraisal of that asset to determine the proposals for action for the administration of the succession.[5] The requirement for an arms-length sales price does not mean that the fiduciary may negotiate with the heirs which he represents and, after wearing them down with incomplete information, arrive at a price which can be justified as though market value has been obtained.
As a final matter, we have reviewed the record for a determination of the damages. The basic theory of reparation for the breach of a fiduciary duty is that the damaged party should be returned as nearly as possible to his condition prior to the act causing the damage. Langendorf v. Administrators of Tulane Ed. Fund, 361 So.2d 905 (La.App. 4th Cir.1978), writs denied, 363 So.2d 1384 and 364 So.2d 120 (La.1978). However, when property has been sold and cannot therefore be returned to the succession, defendants are liable for damages in the amount of the difference between the market value at the time of the respective sale to the fiduciary and the actual sale price received by the succession. Succession of Irving, supra.
*467 Joe and Hodge purchased the succession's one-third interest in TCC in September 1984 for $100,000 and sold TCC in May 1985 for $1,900,000. Due to the relatively short time period between acquiring the succession's interest and selling the company and because the actual selling price fell within the value range testified to by the brokers, we find that $1,900,000 was the fair market value of TCC in September 1984. Considering TCC's debts and the brokerage commission which were paid by Joe and Hodge out of the sale proceeds, we place the net value of TCC at $1,550,000.[6] Therefore, the succession is entitled to damages in the amount of $516,666.67 less the $100,000 received in the sale to Joe and Hodge, plus interest from date of judicial demand.

Decree
For the foregoing reasons, it is ordered, adjudged, and decreed that there be judgment rendered in favor of the succession of Anthony S. Scurria and against Joseph S. Scurria and Billy Charles H. Hodge in the amount of $416,666.67, plus interest from the date of judicial demand. Costs are assessed to appellees.

REVERSED AND RENDERED.

APPLICATION FOR REHEARING
Before MARVIN, C.J., and HIGHTOWER, BROWN, STEWART and CARAWAY, JJ.
Rehearing denied.
NOTES
[1] TCC was technically the borrower of $191,000 used to pay the estate for its one-third interest in the corporation and the outstanding loans owed by TCC to Anthony. Joe and Hodge signed the loan in their capacities as corporate officers and the stock of TCC was pledged as security.
[2] For example, La. Admin. Code tit. 61, § I. 4301(3) (1987) defined market value for purposes of the Department of Revenue and Taxation as follows:

[T]he reasonable market value of tangible personal property is the amount a willing seller would receive from a willing buyer in an arms-length exchange of similar property at or near the location of the property being valued. The amount which would be realized from a "forced" sale is not acceptable as the market value for this purpose.
[3] The brokers testified that, in optimum circumstances, it was generally accepted that a cable system could be operated at a fifty percent cash flow level meaning fifty percent of the revenues went to the cost of operations with the other fifty percent being net profit before taxes.
[4] In fact, the financial statements reveal that as of December 31,1984, TCC had an actual annual gross revenue of $435,037.84.
[5] We need not evaluate the various proposals for other actions in September 1984, including the administrator's exercise of the power to borrow under La. C.C.P. art. 3228 or the calling of the TCC loans owed to the succession for $91,000. The administrator had the duty to make such proposals in the light of a full understanding of the value of TCC, and Joe never obtained such understanding or made an objective disclosure.
[6] We have utilized the full market value of the corporation for the determination of the value of the succession's minority share position. The February 1984 amendments to the corporation's bylaws deleting the provisions for the unanimous consent of the shareholders, establishing a board of directors, and restricting the sale of stock in the corporation were detrimental changes, diminishing the power and value of the succession's minority shareholdings. Such depletion of the succession's interest resulting from Joe's vote of the succession's shares and his personal shares would itself present a serious breach of Joe's fiduciary duties but for the contemporaneous agreement of the shareholders to effectively liquidate the corporation through the sale of the corporation as a whole.