763 So.2d 144 (2000)
EXXON PIPELINE COMPANY
v.
George HILL, Individually and as Trustee of the Mrs. Elizabeth J. Hill Trust for the Children of John Hill, Jr., et al.
No. 99 CA 0073.
Court of Appeal of Louisiana, First Circuit.
June 23, 2000.
Rehearing Denied July 31, 2000.
*146 Leon Gary, Jr., Robert W. Scheffy, Jr., Baton Rouge, Counsel for Plaintiff/Appellee Exxon Pipeline Company.
David Ellison, Baton Rouge, Counsel for Defendants/Appellants George Hill, Individually *147 and as Trustee of the Mrs. Elizabeth J. Hill Trust for the Children of John Hill, Jr., et al.
Before: SHORTESS, C.J., WHIPPLE, PARRO, FITZSIMMONS, and KUHN, JJ.
KUHN, J.
Defendants-appellants, the Hill family,[1] appeal the judgment of the trial court awarding $17,172.00 as just compensation for the expropriation of a pipeline servitude by plaintiff-appellee, Exxon Pipeline Company ("Exxon"). We conclude the trial court legally erred in its conclusion that the testimony of appellants' expert real estate appraiser was inadmissible and vacate the award. Upon a de novo review of the record, including the proffered testimony of appellants' expert real estate appraiser, we award the Hill family $251,505.00, i.e., $250.00 per rod × 335.34 rods × 3 pipelines, as just compensation for the taking of their property for a public purpose.

FACTUAL AND PROCEDURAL BACKGROUND
On January 13, 1998, Exxon filed a petition for expropriation in West Baton Rouge Parish against the Hill family, averring entitlement to a permanent servitude for the installation of three pipelines.[2] On March 2, 1998, the Hills answered, generally denying the allegations of Exxon's petition. A three day trial on the merits was held in July 1998. Prior to trial, the parties stipulated that Exxon was a common carrier of petroleum products entitled to expropriate,[3] and to the necessity of Exxon's taking and proposed route selection.[4]
The Hill family owns a tract consisting of approximately 900 acres located in West Baton Rouge Parish, which is known as the Homestead Plantation. In 1936, Exxon obtained its first pipeline servitude across the Hill property. The terms of that servitude agreement did not specify either the length or the width of the land affected by the right of way granted to Exxon. Subsequent amendments to the 1936 servitude agreement limited Exxon's right of way to an eighty foot wide strip of land and allowed for the installation of eight pipelines. In 1995, Exxon obtained another conventional servitude which consisted of a right of way over a strip of land over one mile long and varying in width from fifty to seventy-five feet and permitted *148 the installation of five additional pipelines within that right of way. The right of way obtained in 1995 is located adjacent to and runs parallel with the eighty foot wide right of way obtained earlier by Exxon. The subject property which Exxon has chosen to expropriate in this instance consists of a permanent pipeline servitude superimposed on the right of way conventionally granted to it in the 1995 pipeline servitude agreement. Essentially, the property which Exxon seeks to expropriate is a servitude allowing it the right to install three additional pipelines within the strip of land upon which an Exxon right of way is situated, i.e., Exxon has requested no additional land in this lawsuit.
On July 24, 1998, the trial court issued a judgment awarding to the Hills the sum of $17,172.00 as just compensation for the expropriated property[5] and taxed all costs against them. After a hearing, the trial court granted Exxon's motion for new trial and by judgment signed on August 17, 1998, modified its earlier judgment to add an order of expropriation in favor of Exxon, a description of the pipeline servitude, a property description indicating its specific location on the Homestead Plantation, and a delineation of the appurtenant rights accompanying the servitude. The award of $17,172.00 as just compensation to the Hill family for the expropriated property was not disturbed. The Hill family appeals, urging that the trial court erred in its determination that the testimony of their expert real estate appraiser was inadmissible which therefore tainted its factual conclusion of the highest and best use of the expropriated property.[6]

EXPROPRIATION
Expropriation of private property for public purposes is addressed in Article I, *149 Section 4 of the Louisiana Constitution, providing in pertinent part:
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss.
Article I, Section 4 does not specify how to fully compensate a landowner whose property is taken; however, it does provide that the landowner should be compensated for "his loss" and not merely the loss of the land. State Through Dep't of Highways v. Constant, 369 So.2d 699, 701.
Louisiana Revised Statutes 19:9 provides the following:
A. In estimating the value of the property to be expropriated, the basis of assessment shall be the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work.
B. The owner shall be compensated to the full extent of his loss....
Thus, the landowner is entitled to the market value of his or her expropriated land as "just compensation" for the taking.
The market value approach examines the worth of the land in light of the highest, best, and most profitable use to which it may be reasonably put in the near future by reason of its location, topography, and adaptability. City of Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So.2d 445, 447 (1951), amended and affirmed, 223 La. 1079, 67 So.2d 732 (1953); State, Dep't of Highways v. Rapier, 246 La. 150, 164 So.2d 280 (1964). In seeking to determine a highest and best use of property which would have an effect on the market value of the property at the time of expropriation in that it would be considered by a willing purchaser and is not remote or speculative, several factors may be considered, including, but not limited to: market demand, proximity to areas already developed in a manner compatible with the intended use, economic development in the area, specific plans of businesses and individuals, including action already taken to develop the land for that use, scarcity of land available for that use, negotiations with buyers interested in the property taken for a particular use, absence of offers to buy the property made by buyers who would put it to the use urged, and the use to which the property was being put at the time of the taking. See M. Dakin and M. Klein, Eminent Domain in Louisiana 171-72 (1970, Supp.1978) (as cited in West Jefferson Levee District v. Coast Quality Constr. Corp., 93-1718, p. 18 (La.5/23/94), 640 So.2d 1258, 1274); State, Dep't of Transp. and Dev. v. Hammons, 550 So.2d 767, 771 (La.App. 2d Cir.1989); State, Dep't of Transp. and Dev. v. Boagni, 509 So.2d 471, 473 (La.App. 3d Cir.1987). Potential uses of the property must overcome a presumption in favor of the existing use. State, Dep't of Highways v. Rapier, 164 So.2d at 282.
The most reliable and approved method for determining the fair market value of immovable property is to consider comparable sales, adjusting them to compensate for their good and bad features with regard to the subject property. State, Dep't of Transp. and Dev. v. Mayet, 521 So.2d 671, 672 (La.App. 1st Cir.1988). *150 Although the study of comparables is the primary tool of analysis, all of the tools of evaluation, including the determination of highest and best use, the study of comparables, the cost of structure and depreciation studies, and income analysis, are only means to fixing just and adequate compensation. No one of the tools is an end in itself. If there is a priority attached to the study of comparables, it exists only because, in most cases, that approach is most likely to produce accurate results, insuring just and adequate compensation. When, however, the study of comparables does not, as a matter of fact, serve best to ensure an accurate evaluation, the prime consideration of just and adequate compensation requires that courts be free to use any other method better suited to a correct assessment of value. State, Dep't of Highways v. Crow, 286 So.2d 353, 356 (La.1973). In an expropriation proceeding, the factfinder's factual determinations as to value of property and entitlement to any other types of damages will not be disturbed on review in the absence of manifest error. State through Dep't of Transp. and Dev. v. Estate of Davis, 572 So.2d 39, 45 (La.1990).

EXPERT TESTIMONY
On appeal, the Hill family urges the trial court's determination that the testimony of expert real estate appraiser, Oren W. Russell, regarding the value of the subject property, was inadmissible is erroneous. The Hill family asserts that the exclusion of their expert's testimony constituted prejudicial error.
Louisiana Code of Evidence article 702 sets forth the general rule for the admissibility of expert testimony in Louisiana:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Subsumed in the requirements of art. 702 is the premise that expert testimony must be reliable to be admissible. State v. Foret, 628 So.2d 1116, 1121 (La. 1993).
In Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the U.S. Supreme Court examined the admissibility of new techniques as a basis for expert scientific testimony. The Daubert court concluded that the trial court is to act in a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. at 2795. This requirement stems from a belief that the rules on expert testimony serve to relax "the usual requirement of first-hand knowledge" to ensure reliability on the part of a witness. This relaxation is justified so long as "the expert's opinion (has) a reliable basis in the knowledge and experience of his discipline." State v. Foret, 628 So.2d at 1122 (citing Daubert, 509 U.S. at 590, 113 S.Ct. at 2796).
The reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." This connection is to be examined in light of "a preliminary assessment" by the trial court "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." State v. Foret, 628 So.2d at 1122 (citing Daubert, 509 U.S. at 590, 113 S.Ct. at 2796).
Suggestions as to how a court could fulfill its gatekeeping role include whether or not the technique had been subjected to peer review and/or publication, the "known or potential rate of error," the existence of "standards controlling the technique's operation," the technique's "refutability" or, more simply put, testability, and, finally, an incorporation of the earlier jurisprudential *151 rule of general acceptance in the scientific community as but one factor in the analysis. State v. Foret, 628 So.2d at 1122 (citing Daubert, 509 U.S. at 590, 113 S.Ct. at 2797).
Other rules of evidence govern expert testimony, namely the balancing test of La. C.E. art. 403 which excludes probative evidence if outweighed by its potential for unfair prejudice.[7] Because there is a possibility that the expert's testimony can be quite misleading and prejudicial if this gatekeeping role is not properly satisfied, a flexible approach and a careful evaluation of the methodology surrounding the testimony and its conclusions is required. See State v. Foret, 628 So.2d at 1122.
The gatekeeping obligation requiring an inquiry into both relevancy and reliability applies not only to "scientific" testimony, which was the focus of the Court's consideration in Daubert, but to all expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999). The objective of the gatekeeping requirement is to ensure, through reliability and relevancy, that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in a relevant field. Kumho Tire Co., 526 U.S. at 151-52, 119 S.Ct. at 1176. While the particular questions suggested by the Court in Daubert will often be appropriate for use in determining the reliability of the challenged expert, a trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of the expert testimony. Id. Thus, in Kumho Tire Co., the Court concluded that the general principles set forth in Daubert established a standard of evidentiary reliability which "requires a valid ... connection to the pertinent inquiry as a precondition of admissibility." Kumho Tire Co., 526 U.S. at 149, 119 S.Ct. at 1174. Where the factual basis, data, principles, methods, or their application by an expert in his testimony are called into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. Id.
The decision of whether to accept a witness as an expert in a trial is left to the discretion of the trial court, and the decision reached by the trial judge will not be disturbed on appeal unless it is clearly erroneous and involves a misunderstanding of law. Hattori v. Peairs, 95-0144, p. 7 (La.App. 1st Cir.10/6/95), 662 So.2d 509, 514, writ denied, 95-2677 (La.1/12/96), 666 So.2d 322.
In exercising his gatekeeping obligation, the trial court concluded that Russell's appraisal, indicating the value of the subject property, was not reliable under the suggestions set forth in Daubert and did not reach the issue of its relevancy. The exclusion of Russell's testimony occurred during the presentment of the Hill family's case in chief. Upon objection to the admissibility of Russell's testimony by Exxon, the trial court took a brief recess and then subsequently rendered its ruling. Finding that Russell's qualifications to testify on the value of the subject property "fails on all four tests" elaborated in Daubert, the trial court concluded that the real estate appraiser's testimony was inadmissible.
The preliminary assessment undertaken by the trial court occurred solely during the voir dire examination of the real estate appraiser's qualifications to testify as an *152 expert and was the only evidence the trial court had before it at the time of its gatekeeping determination. Russell candidly admitted that the contents of his report were the result of an evolving technology. He acknowledged that he had not published the underlying premises of his evaluation, and that the particulars of the approach had not been used in his prior courtroom testimony or been subjected to peer review. According to Russell, the American Institute, the premier educational organization of appraisal technology and methodology in the U.S., does not offer a traditional peer review service. He explained that his manner of valuation of pipeline servitudes was in conformity with the Uniform Standards for Professional Appraisals, and that it utilized the market approach.
Based on this limited showing, the trial court concluded that Russell's expertise was unreliable and therefore excluded it from evidence.[8] At the time of the ruling on the admissibility of Russell's testimony, the record lacked sufficient information for the trial court to ascertain whether Russell's manner of appraising the subject property constituted a valid connection to the pertinent inquiry, i.e., valuation of the subject property. See Kumho Tire Co., 526 U.S. at 147, 119 S.Ct. at 1174. Moreover, the trial court operated under the belief the Daubert indicia of reliability were to be applied as a bright line rule of admissibility. This has subsequently been jurisprudentially clarified to be a more flexible consideration in Kumho Tire Co., 526 U.S. at 147, 119 S.Ct. at 1174. In light of the limited information the court had before it and its rigid application of the Daubert suggestions, we find the trial court, operating under a misunderstanding of the law, abused its discretion when it concluded Russell's testimony was unreliable.
An examination of the proffered testimony of real estate appraiser Russell to ascertain whether the specialized knowledge upon which he formulated his opinion was reliable under the more flexible standards enunciated in Kumho Tire Co. reveals the following. Russell is an appraiser who has been involved in real estate for over thirty-five years and has testified in over 200 cases. He began appraising commercial properties in 1975. Although his background in servitude acquisitions has been primarily with utilities, he has appraised pipeline servitudes as well, including an appraisal of the land affected by the conventional servitude which Exxon and the Hill family entered into in 1995.
Russell testified that it was during the 1995 Hill family appraisal that he began to question the logic of the traditional method of valuation of pipeline servitudes and to collect the information which has resulted in the theory of the market value approach to which he presently adheres. Describing the traditional application of the methodology articulated in the uniform standards of the American Institute, Russell explained that determination of value based on the acreage contained in a parent tract, and with a consideration of the highest and best use, which is then reduced to the width and depth of a right of way did not make sense to him.
It is undisputed in this case that the pipeline industry utilizes the rod as its standard measurement in the negotiations with landowners for valuing land encumbered by pipeline servitudes.[9] Russell stated he "came to the conclusion that there is no relationship between a rod and a price per acre or price per square foot. A rod, by definition, is nothing more than a line between two points, but as such it has no width. So there is no relationship between a rod and price per square foot." Russell explained that the traditional approach to pipeline servitude valuation is *153 premised on the fact that the presence of the servitude diminishes the value of the surface rights because the landowner is precluded from building on top of it. An appraiser then reduces the value of the acreage determination of the affected strip of land by eighty percent to reflect this diminution caused when the servitude is created. Thus, the landowner's per acre valuation of his land is worth only twenty percent of its value prior to the imposition of the predial servitude.
According to Russell, this approach makes sense when the first pipeline servitude is taken. However, in a situation where a second servitude is superimposed on the exact same land containing the right of way, Russell finds no correlation with the property being expropriated and the per acre determination reduced by eighty percent of its original value. He noted that the right to build, which is the diminution represented by the reduction of eighty percent, was taken with the presence of the first servitude. It is precisely because the tract of land affected by the right of way has already lost the value associated with the right to build that the real estate appraiser opines that the highest and best use of the affected subject property is as a pipeline/utility corridor.[10]
Referring to the American Institute's professional manual, entitled "The Appraisal of Real Estate," Russell recited the elements of comparison the book advises should always be considered in comparable sales analyses. These include location, legal, i.e., the real property rights conveyed, financing terms, conditions of the sale, market considerations, physical characteristics, economic characteristics and use. Based on these criteria, Russell concluded that in order for a comparable to be truly comparable to the subject property, it would have to be long and slender and in use as a pipeline or utility corridor. Thus, the underlying premise upon which Russell formulated his opinion of the value of the subject property was that in exercising the market approach, the comparable sales which should be examined by the appraiser were sales of pipeline acquisitions for rights of way. Because the Hill family property which Exxon chose to expropriate was totally encumbered by a pre-existing servitude and did not include the removal of the right to build over additional acreage, Russell found the sales of pipeline servitudes with the same limiting characteristics to be the most applicable comparable sales an appraiser undertaking the market approach could examine.
Noting that the amounts of compensation paid to landowners by pipeline companies on the open market were consistently superior to the amounts yielded by the traditional parent tract/acreage, eighty percent depreciation approach, Russell undertook a study of over 900 sales of pipeline rights of way. The lack of a data base of pipeline sales from which to draw and the presence of confidentiality provisions within the pipeline sales agreements publicly recorded were among the reasons Russell's manner of valuation has been considered as a new one.
We find that the method of valuation testified to by Russell in his proffered testimony has a reliable basis in the knowledge and experience of real estate appraisal. Thus, it constitutes a valid connection to the pertinent inquiry of valuation of just compensation for the subject property, and as such, was reliable. The purpose of including the expert testimony of the real estate appraisers of the respective parties was to assist the trier of fact with its determination of the market value of the *154 subject property, i.e., a pipeline servitude which included the taking of no additional land but allowed for Exxon to install three additional pipelines within the confines of the land it was already utilizing for a right of way pursuant to the 1995 conventional servitude agreement. The trial court permitted the expert testimony of Exxon's real estate appraiser to assist it in the determination of the value of the subject property, evincing the relevancy of such testimony.[11] Thus, the inquiry of whether Russell's testimony should have been admitted hinges solely on the reliability of the specialized knowledge upon which his opinion of the value of the subject property was formulated.
As noted by the Mayet court, 521 So.2d at 673, the trial court is granted great discretion in the valuation of real estate. That discretion requires, however, that the respective parties be afforded the opportunity to present their valid theories of valuation. We refuse to hold that as a matter of law valuation of pipeline servitudes, which include the acquisition of no additional land but simply the use of a preexisting right of way for the installation of additional lines, must be based on a determination of value in acreage of a parent tract, depreciated to twenty percent its full value because of the existence of pipelines and then reduced to the length and width of the land effected by the installation of additional pipelines. We chose not to "straight jacket" the field of real estate appraisal with a single manner of applying the criteria which constitute the market value approach.
Our examination of the evidence convinces us that the primary difference between the theories of the expert appraisers is in the use of sales comparables. Russell opines that when an area is determined to have its highest and best use as a pipeline corridor, a true reflection of the market suggests that comparable sales of rights of way with the same general limiting physical and legal characteristics is the most logical. While stating that the highest and best use of the subject property at issue was for agricultural purposes on an interim basis with a long term highest and best use as industrial, Exxon's appraiser, Jack Evans, testified that comparable sales of tracts of land reduced to a value per acre and then prorated to the square footage of the strip of land affected by the right of way reflects the value of the subject property. In calculating the amount the landowner is entitled to receive for the subject property expropriated, the prorated, per acre amount is depreciated by eighty percent for each subsequent servitude imposed upon the tract of land affected. Thus, the more servitudes sought, the less the value of the subject property according to the Exxon expert's approach.
Essential to the valuation of expropriated property is a determination of highest and best use. See City of Shreveport, 52 So.2d at 447. The market value approach includes an examination of comparable sales; however, we do not believe that comparable sales are, in all instances, limited only to sales of tracts of land as a matter of law. The determination of what *155 constitutes a comparable sale, necessarily interdependent with the highest and best use evaluation, is but one aspect of the factual basis necessary to support the trial court's overall conclusion of the amount of just compensation a property owner is entitled to receive when it has been put to a public use. Exclusion of the Hill family's expert real estate appraiser was prejudicial error which interdicted the factfinding process and requires us to conduct a de novo review of the evidence. See Jordan v. Intercontinental Bulktank Corp., 621 So.2d 1141, 1152 (La.App. 1st Cir.), writs denied, 623 So.2d 1335, 1336 (La.1993). Because Russell was not permitted to testify, the trial court necessarily accepted the testimony of Exxon appraiser Evans to support the factual finding of the highest and best use of the subject property. Therefore, the trial court's finding on that issue is affected by the prejudicial exclusion of Russell's testimony and is within the ambit of our de novo review.
Family member, George Hill, testified that on the date of trial, the Homestead Plantation had six north-south corridors containing pipelines and identified the respective location of each. He described the locations of various industrial facilities surrounding and adjacent to the Hill family's property including Exxon's Anchorage Terminal Area, which consists of a tank farm; Exxon's lubricant plant; Placid Refining Co.'s facility; Exxon's gas plant northwest of the property; and a site for which a fractionating plant was under construction by several oil companies.
Exxon employees, Paul Saltaformaggio and Malcolm South, each testified that when considering installation of another pipeline, Exxon prefers to stay within existing rights of way which are being utilized for pipelines or utilities. The collective testimony of the Exxon employees was that by staying within a pre-existing Exxon pipeline right of way, the federal, state and local permitting process was streamlined. South also indicated that by installing a new pipeline into a pre-existing right of way, the environmental impact is less because the installation of the earlier line has already addressed those concerns. In his testimony, Saltaformaggio conceded that construction of new pipelines near pre-existing Exxon pipelines allowed Exxon to regulate the flow of the contents in the pre-existing pipelines making it easier.
Russell testified that the highest and best use of the subject property was as a pipeline/utility corridor. His study of comparable sales of pipeline rights of way showed that willing pipeline companies, including Exxon, paid landowners willing to sell rights of way for pipeline use. These reflected, among other things, pipeline use from $50.00 to $1,353.00 per rod. Landowners obtained total sums ranging from $2,265.00 (for 45.30 rods at $50.00 each) for three pipelines to $614,604.00 (for 1,781.46 rods at $345.00 each) for a single pipeline. Russell's study included prices paid per rod for tracts of land affecting various widths, ranging from fifteen feet to seventy feet wide. Also contained in his study were notations of the number of pipelines the landowner had agreed to permit the pipeline company to install. Based on his evaluation of the data he collected, Russell opined that $350.00 per rod, per pipeline, justly compensated the Hill family for the expropriation of their property. Noting that the subject property was 335.34 rods, Russell concluded that the Hill family was entitled to $352,107.00 in just compensation.
After observing the natural conditions of the Hill family's approximately 900-acre tract of land, Exxon's appraiser, Evans, determined that a parent tract of approximately 350 acres adequately represented the size of the appropriate comparable sales to commence gathering for his appraisal. Based on the parent tract of 350 acres within the Homestead Plantation, Evans stated that the interim highest and best use of the subject property was for agricultural purposes, but due to the surrounding industrial development in the area concluded that industrial use was its *156 long term highest and best use. Evans utilized sales of tracts of land ranging in size from 10 to 215.88 acres which were sold for amounts ranging from $2,935.00 to $45,000.00 per acre. Testifying that he had probably overstated the value, Evans concluded that the parent tract was worth $14,000.00 per acre.[12] Noting that the land encumbered with the pre-existing Exxon pipeline servitude spans 7.66 acres in length and width and multiplying it by the twenty percent value it has after depreciation for the presence of Exxon's preexisting right of way, Evans testified that the value of the subject property prior to Exxon's taking for a public purpose was $21,465.00. Further reducing that before taking value by eighty percent, Evans explained, "They only had twenty [percent] to begin with. [That's] [a]ll that was left, it was already encumbered. That part of the bundle of rights was gone." Thus, he valued the subject property at $17,172.00.
Based on the evidence, we conclude that the highest and best use of the subject property in this case is as a pipeline/utility corridor. We find that the amount of $250.00 per rod per pipeline will justly compensate the Hill family. Accordingly, we award $251,505.00, i.e., $250.00 per rod × 335.34 rods × 3 pipelines.[13]
Exxon suggests that to award compensation for the servitude taken, a sum of money based on the number of rods (i.e., on a "per rod basis") rather than the number of acres (i.e., on "a per acre basis") has the effect of granting the property owner an amount of just compensation greater than complete transfer of title in full ownership of the property would allow. Exxon's position ignores accepted appraisal techniques and those which have customarily been applied by the court. See e.g., State, Dep't of Highways v. Rapier, 164 So.2d at 280; Pointe Coupee Elec. Membership Corp. v. Mounger, 447 So.2d 1104, 1109-10 (La.App. 1st Cir.1984) (establishing that value is determined after a conclusion of the highest and best use of property).
It is well accepted that the market approach customarily used by appraisers requires the determination of highest and best use of the property being taken. Upon de novo review of the facts, we have concluded that the highest and best use of the subject property is as a pipeline/utility corridor. Having determined the highest and best use, under La. Const. Art. I, sec. *157 4, our next obligation is to value the property expropriated, here a servitude over a pipeline corridor, and arrive at a sum of money to fully compensate the property owner to the full extent of his loss. In arriving at a sum, we must determine what the value of the property which has been expropriated is when that property has a highest and best use a pipeline/utility corridor. Based on the undisputed evidence in this record, that within the pipeline industry the standard measurement of the valuation of pipeline servitudes on the open market is on a per rod basis, we believe it is appropriate to use the "per rod basis" rather than an acreage basis. To do otherwise ignores the correlation between the determination of highest and best use and valuation of the expropriated property. Furthermore, it ignores the potential that a large tract of land may have different portions of property with different values based on different determinations of highest and best use.
In the case before us, the highest and best use for different portions of the land owned by defendants is different. This is because the servitude expropriated has a different highest and best use (pipeline/utility corridor) than the larger, undeveloped remainder of the property. Consequently, the large tract remaining may have a lower value (per acre) than the expropriated servitude (per rod). Nevertheless, it is not the remainder of the tract of land owned by defendants which has been expropriated by Exxon; the subject property, with a highest and best use as a pipeline corridor, is a servitude in the form of the right to install additional pipelines into a narrow strip of land. We have concluded that this strip of land, a pipeline/utility corridor, measured by rod rather than by acre is in accord with a well accepted pipeline industry technique of measurement and determination of value.
Where an expropriating authority tenders less than true value, as subsequently determined by the courts, all costs of the suit are assessed against the expropriator. La. R.S. 9:12; See State Through Dep't of Highways v. Hunt, 219 So.2d 602, 609 (La.App. 1st Cir.1968), writ granted and modified on other grounds, 255 La. 513, 231 So.2d 563 (1970); Lake Charles Harbor and Terminal Dist. v. Prestridge, 182 So.2d 334, 339 (La.App. 2d Cir.1966). Therefore, all costs in the trial court are assessed against Exxon.
Louisiana Revised Statutes 19:8(A) states in relevant part:
Immediately after compensation has been determined, the plaintiff shall, upon motion of the defendant, present evidence as to the highest amount it offered the defendant for the property prior to trial on the merits. After hearing evidence on the issue, the court shall determine the highest amount offered. If the highest amount offered is less than the compensation awarded, the court may award reasonable attorney fees.
Because the trial court awarded the Hill family $17,172.00 as just compensation, an amount less than the $225.00 per rod final offer Exxon made prior to filing this lawsuit, the Hill family was precluded from offering any evidence on the issue of attorney fees. However, on our de novo review, because we have awarded the Hill family $250.00 per rod per pipeline, an amount which exceeds Exxon's final prelitigation offer, we conclude the Hill family is entitled to their reasonable attorney fees. Exxon Pipeline Co. v. LeBlanc, 99-0073, pp. 19-20 (La.App. 1st Cir. 06/23/2000), 763 So.2d 142-43; see Rivet v. Dep't of Transp. and Dev., 96-1045, pp. 11-12 (La.9/5/96), 680 So.2d 1154, 1161-62. Based on our review of the record, we conclude the amount of $75,450.00 constitutes reasonable attorney fees under the facts of this case.

CONCLUSION
For these reasons, the part of the judgment which awards to the Hill family $17,172.00 as just compensation is reversed. Upon de novo review, we award *158 to the Hill family $251,505.00, i.e., $250.00 per rod × 335.34 rods × 3 pipelines, as just compensation for Exxon's expropriation of the subject property and attorney fees in the amount of $75,450.00. Appeal costs in the amount of $5,832.00, as well as all costs incurred at the trial court, are assessed against Exxon Pipeline Company. In all other respects the August 17, 1998 judgment is affirmed.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
SHORTESS, C.J., concurs with reasons.
WHIPPLE, J., concurs for reasons assigned by SHORTESS, C.J.
FITZSIMMONS and PARRO, JJ., dissent, and assign reasons.
SHORTESS, C.J., Concurring.
I agree with the majority opinion and especially our finding that the trial court manifestly erred in failing to qualify Oren Russell as an expert. I write to further explain my thoughts on this changing area of the law.
Initially, in Gulf States Utilities Company v. Norman,[1] the third circuit speaks through Judge (later Justice) Albert Tate. The facts of Norman parallel the facts herein. There, GSU was expropriating a servitude for electricity transmission lines and needed approximately 39 acres, about 9,959 feet, or 1.9 miles in length. Upon this servitude GSU planned to construct large structures ranging from 105 to 295 feet high, with cross arms 90 feet in width. Here, Exxon plans to construct three subterranean pipelines with maximum outside dimensions of twenty-four inches. GSU's evidence of value consisted of experts using the traditional comparable-acreage sales method. The experts arrived at an estimated value of $140 per acre.[2] The Norman property owners contended that a better guide to market value of the servitude to be taken was furnished by certain comparable sales of servitudes in the vicinity, and more specifically, pipeline servitudes. They arrived at an estimated value of $2,000 per acre.
After analyzing the particulars of each side's methodology, the Norman court said the "basic purpose in all cases, however, is to determine the just and adequate compensation required by our constitution.[3] Whatever approach or formula of valuation used, it should take into consideration `all factors which lead to a replacement of the loss caused by the taking.'"[4] Applying this test, using the pipeline-servitude comparables, the third circuit found the fair market value of the property to be $500 per acre.
It is interesting to note, and the record here fully supports, that Exxon, in private negotiations and arms-length transactions, used the per-rod valuation. When Exxon expropriated, however, its experts used the market-value comparables, i.e., acreage method.
In 1989 the fourth circuit in Louisiana Intrastate Gas Corporation v. Gulf Outlet Lands, Inc.,[5] was confronted with a pipeline-servitude expropriation. The trial court had based its judgment on the use of comparable pipeline rights of way and valued the rights of way at $115 per rod. The expropriating plaintiff argued that the court should have used comparable land sales. In affirming the trial court, the fourth circuit stated: "We are not persuaded by plaintiff's argument that when attempting to value a pipeline right-of-way the court should not use evidence of the *159 amounts paid for other pipeline rights-ofway."[6] The court noted that the property to be taken was a strip 30 feet wide and 18,353.8 feet long, which was not to be used in any per-acre configuration, and any useful per-acre configuration was unimaginable. It further noted that plaintiff's offer was by the rod, not by the acre.
In 1990 ANR Pipeline Company v. Succession of Bailey,[7] addressed some of the issues involved when the only question before the court was the amount of just compensation. Therein, the expropriator's experts used the traditional comparables per-acre valuation and came to valuations of $2,500 per acre and $6,000 per acre. Plaintiff's experts disagreed as to the highest and best use. The expert whose valuation was $2,500 per acre felt agriculture was the highest and best use. Plaintiff's other expert felt the property's highest and best use was for rural homesites.
Defendant's expert felt the highest and best use was for light industrial. And he used leases of pipeline servitudes as his comparables. Here, like Louisiana Intrastate Gas Corporation v. Edwards,[8] the trial court had the benefit of both acreage and rod comparables. When the trial court can weigh the evidence and pick the methodology that best does justice for the litigants, the manifest-error presumption requires us to affirm upon appellate review. As we stated in Succession of Bailey, "Once the trial court made the factual determination that the highest and best use of the property was light industrial, it had ample reason for rejecting the opinion of plaintiffs appraisers as to the value of the land."[9]
Exxon forcefully argues that any reliance on Norman is misplaced because the third circuit later, in Louisiana Intrastate Gas Corporation v. Edwards, limited its effect by holding that it was not controlling if other types of comparables were available.
Stripped right to the basics, the question is whether market-value acreage valuation can ever be comparable to sales or leases of servitudes for pipeline purposes. Peracre comparables as opposed to per-rod comparables just do not fit what Professor Melvin Dakin described in his treatise Eminent Domain in Louisiana: "Whether a particular sale of a parcel is found to be comparable depends upon a number of factors. The most frequently judicially considered factors include proximity in time and circumstance of the sale, location of the land, size of the parcel, and physical characteristics of the law."[10]
Since 1966, the law has been evolving in the area of pipeline expropriation. Norman created an exception to the acreage methodology. And it makes sense. Why should very long, linear strips be valued for expropriation according to the rules for acreage? There is a split in the circuits. The first and fourth circuits are more in line with the per-rod theory, while the third circuit seems to be more favorable to the per-acre theory, notwithstanding Norman. I think it is time to unconditionally rule that the per-rod theory is the favored one, especially on land that is already burdened with multiple pipeline servitudes.
I respectfully concur.
FITZSIMMONS, Judge, dissenting, with reasons.
The issue is not what measure of land should be used for valuation, acre or rod, but what comparables should be averaged. The per acre comparables accessed should be for the reasonably anticipated highest and best use of the property at the time of expropriation. The per rod comparables, *160 however, appear to show the value of the property as impacted by the expropriation itself.
The expropriated use here is a so-called "pipeline corridor." The difference in valuation can perhaps be better understood by considering the expropriation of land for the interstate system, a "car corridor." Arguably, preservationists view the interstate system through cities as a negative impact, which is sometimes the case. From an economic viewpoint, the construction of a super highway through a city often improves the value of blighted or under utilized property. The appraised value of the highest and best use of the property expropriated for a highway does not include the value after the expropriation or the value the property will have as a result of the changes caused by the expropriation. In these pipeline cases, the per rod comparables are primarily based on the value of the property as impacted by the expropriation, that is, the highest and best use is said to be as a "pipeline corridor."
The impact of the future expropriated use on the value of the land should not be taken into account. To do so will raise the value of all expropriated lands to such a level that many necessary public, or public use, projects will be too costly, even for governments. The power of expropriation is given because the project is for the public good. If the Exxon pipeline does not sufficiently benefit the public, the answer is to remove the power of expropriation, not allow the values to be manipulated. Once the argument can be made that the property should be valued based on its future expropriated use or value after expropriation, be it pipelines or land fronting interstate systems or improved highways, the Pandora's box of abnormally escalating values will be opened. For these reasons, I respectfully dissent.
PARRO, J., dissenting.
The majority opinion seemingly stands for the proposition that a virgin piece of property has a lesser value than one that has been raped. I do not subscribe to this proposition.
I disagree that the value of the property expropriated in this case (and the companion cases also decided this date[1]) is to be determined by comparing negotiated sales of pipeline servitudes on a "per-rod" basis, rather than by considering the "per-acre" fair market value of the property upon which the servitude is imposed. The trial court's rejection of the LeBlancs' expert's testimony applying this valuation method was a responsible exercise of its discretion and its "gate keeping" function, and should be affirmed.
Article I, Section 4 of the Louisiana Constitution states that when property is expropriated, "the owner shall be compensated to the full extent of his loss." The purpose of the property valuation procedure is to determine the loss to the landowners, not the value of the servitude to the pipeline company. The use of negotiated "per-rod" sales as comparables in this and similar cases will result in the property owners being paid many times more for the transfer of a servitude than they would receive for a transfer in full ownership of the property subject to the servitude. This valuation ignores the constitutional mandate. It is logically inconsistent to conclude that property owners lose more when a servitude is taken, leaving them with full or partial use of the surface of the land, than they would if full ownership of the property were being transferred.
Additionally, under the method of valuation endorsed by the majority, property owners can be compensated for the same "loss" more than once, as pipelines, utility companies, and other entities find it necessary to expropriate for additional lines *161 within already existing servitudes.[2] Instead of deducting some proportionate amount in recognition that such landowners have already been compensated for the partial loss of use of their property to a servitude, this method of valuation uses the existing pipeline/utility servitudes to justify an even higher price in subsequent expropriations.
Private entities authorized by law to expropriate may do so only for a public and necessary purpose. Expropriation exists in our Constitution because the public recognizes that some private property rights must give way for the public good, provided the private property owner is fully and fairly compensated for his loss. The radically new valuation method approved by the majority in this case will add incalculable costs to the public when these expenses are passed on in the prices of oil, natural gas, electricity, water, and other utilities. Thus, the public will suffer, while a few property owners will reap a windfall, simply because they fortuitously own property within the shortest and most efficient routes for the transport of these necessities. The benefits of expropriation intended for the public good will be severely curtailed by this valuation approach.
For these reasons, I respectfully dissent.
NOTES
[1] The landowners named as defendants in this lawsuit are George Hill, individually and as trustee for the Mrs. Elizabeth J. Hill Trust for the children of John Hill, Jr.; John Hill, Jr., individually and as trustee for the Mrs. Elizabeth J. Hill Trust for the children of George Hill; John Hill III and Cynthia Louise Hill Landry, whom we collectively refer to as "the Hill family."
[2] The expropriation of the permanent servitude at issue in the case sub judice was part of Exxon's "SOLA" pipeline project, which was the subject of the companion cases Exxon Pipeline Co. v. LeBlanc, 98-2058 (La.App. 1st Cir.6/23/00) (an unpublished opinion) and Exxon Pipeline Co. v. LeBlanc, 99-1437 (La. App. 1st Cir.6/23/00), 763 So.2d 128, also handed down this day. The record establishes that the first pipeline was designed to have an outer dimension of 24 inches and was to be constructed for the purpose of transportation of petroleum products to and from the Exxon Pump Station in St. James and the Anchorage Chemical Terminal in Port Allen; the second pipeline was designed to have an outer dimension of 12.75 inches and was to be constructed for the purpose of transportation of petroleum products to and from the Exxon Bundle Crossing in West Baton Rouge Parish and the Sorrento Storage Dome in Ascension Parish; the third pipeline was designed to also have an outer dimension of 12.75 inches and was to be constructed for the purpose of transportation of petroleum products to and from the Anchorage Chemical Terminal in West Baton Rouge Parish and the Sorrento Storage Dome in Ascension Parish and the Shell Geismar facility also located in Ascension Parish.
[3] See La. R.S. 19:2(8) and La. R.S. 45:251.
[4] During the trial, the Hills agreed that they were not entitled to severance damages and, on appeal, have raised no contentions suggesting that an award of severance damages is warranted under the facts of this case.
[5] Exxon additionally alleged that it needed a temporary construction servitude in order to construct the three proposed pipelines. At the trial, the Hill family urged entitlement to an award of just compensation for the temporary servitude in addition to the amount awarded for the permanent servitude. By making a single award in conformity with the amount Exxon's expert real estate appraiser opined was the value of the permanent servitude, the trial court implicitly rejected the Hills' claim for additional compensation for the temporary servitude. See Fountain v. Fountain, 93-2176, p. 16 (La.App. 1st Cir.10/7/94), 644 So.2d 733, 743. The evidence adduced at trial showed that the Hills leased out the surface rights of their tract of land, including the area affected by the subject property, to sugar cane farmers and that Exxon settled a crop damage claim with those farmers in accordance with the provisions of the written lease that included a tender of payment to the Hill family. We find no error in the trial court's conclusion that the Hill family was not entitled to an additional award for the temporary servitude expropriated by Exxon and note that on appeal they have made no assertions regarding the lack of an additional award for that claim.
[6] The Hill family asserts as error the failure of the trial court to limit Exxon's appurtenant right of ingress and egress to the terminal ends of the permanent servitude. Rights which are necessary for the use of a servitude are acquired at the time the servitude is established and are to be exercised in a way least inconvenient for the servient estate. La. C.C. art. 743. In this case, the land of the Hill family which is encumbered with the pipeline servitude is the servient estate. See La. C.C. arts. 646, 650 and 651. Therefore, it was incumbent on the Hill family to show a more convenient way in which Exxon could exercise its proposed right of ingress and egress. Exxon representative, Paul Saltaformaggio, testified that the broad right of ingress and egress was in conformity with the 1995 conventional servitude agreement Exxon had entered into with the Hill family. The terms of the 1995 agreement included the location of Exxon's pipeline ten feet below the surface to allow for the construction of three crossings by Exxon, which would permit the Hill family to allow other rights of way to encumber the tract of land at different levels within the area affected by the Exxon servitude. Saltaformaggio considered the construction of the crossings at the Hill family's request to have been a concession in favor of the landowners during the negotiations of the servitude agreement. He testified that whenever the Hill family chose to utilize those crossings, the limitation of Exxon's right of ingress and egress to the terminal ends would prevent it from maintaining the pipelines installed within the right of way. The judgment in this case cross references and incorporates the terms and conditions relative to Exxon's right of ingress and egress set forth in the 1995 conventional servitude agreement. Nothing in the record establishes that during the exercise of its rights under the 1995 servitude agreement, Exxon has in any manner caused inconvenience to the Hill family. We find no error in the trial court's determination under the facts of this case.
[7] Louisiana Code of Evidence article 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
[8] A Daubert hearing for the purpose of assessing the reliability and relevancy of proposed expert testimony was not held in this case.
[9] The record establishes that a rod is a linear measurement of 16 .5 feet.
[10] The evidence established that the pipeline industry utilizes "corridor" as a term of art, referring to instances where a pipeline servitude consists of an enormous number of rods on but a single landowner's tract of land. The landowner typically has standard rates and permits use of the corridor by any party willing to pay the fee. Russell explained, however, that his reference simply meant "a linear tract of land that is used for the purpose of containing either underground or above-surface pipelines or power lines ... [o]r both" when he referred to the highest and best use as a pipeline corridor.
[11] The record clearly establishes that Russell's testimony was relevant. The evidence at trial included the testimony of three Louisiana-licensed attorneys with experience representing landowners in servitude acquisitions. The collective testimony of the witness attorneys shows that companies seeking servitudes with rights of way affecting tracts of land consistently negotiated with landowners by offering compensation calculated on the basis of the number of rods affected by the pending servitude. In testifying about their respective personal experiences, the attorneys indicated recent sales of pipeline servitudes, which were amicable and arms length, i.e., on the open market, ranging in values from between $324.00 to $350.00 per rod for each pipeline installed on land varying in widths from 20-50 feet. These affected both land encumbered with a pre-existing servitude and land adjacent with and parallel to such. Exxon's witnesses, including its expert real estate appraiser, likewise confirmed that the pipeline industry's operational procedure routinely includes negotiations conducted with compensation offerings to landowners calculated on a per rod basis.
[12] In 1995, Evans appraised the same parent tract for Exxon during the negotiation process which resulted in the 1995 conventional servitude agreement. At that time, he opined that the value was $14,000.00 per acre. Due to changes in the real estate market, Evans believed that the parent tract would not sell for $14,000.00 per acre on the date of trial but nevertheless concluded for purposes of this appraisal that $14,000.00 per acre was the market value.
[13] We recognize in the companion case, Le-Blanc v. Exxon Pipeline Company, 99-1437 at p. 15, 763 So.2d at 139-140, also rendered this day, applying our appellate standards of review, this court affirmed the trial court's award of $350.00 per rod per pipeline for the expropriation of that permanent servitude while in this appeal on our de novo review of the facts, sitting as trier of fact we have awarded the Hill family a lesser amount of $250.00 per rod per pipeline. The difference in the per rod valuation between these companion cases is simply a result of the standard of review this court is bound to apply. In LeBlanc, we determined a reasonable factual basis existed to support the trial court's valuation of the pipeline servitude and, therefore, concluded this factual finding by the trial court was not manifestly erroneous. Additionally, the award of $350.00 per rod per pipeline fell within the range which the evidence admitted in that case established pipeline companies paid on the open market to willing sellers of rights of way for servitude use. As such, we could not say that the trial court, as trier of fact, abused its vast discretion in awarding the more generous amount of $350.00 per rod per pipeline. In this case, however, because the trial court legally erred by excluding the testimony of the Hill family's expert real estate appraiser, we have examined the evidence anew and, in our opinion, have concluded $250.00 per rod per pipeline is an appropriate an amount to award under the facts of this case.
[1] 183 So.2d 421 (La.App. 3d Cir.), writs denied, 249 La. 118, 120, 185 So.2d 529 (1966).
[2] This figure includes $60 per acre for the value of standing timber.
[3] The Louisiana Constitution of 1921 was in effect at that time. The Constitution of 1974 applies here. The requirement of just compensation has not changed.
[4] 183 So.2d at 426-427.
[5] 542 So.2d 705 (La.App. 4th Cir.1989).
[6] Id. at 707.
[7] 558 So.2d 689 (La.App. 1st Cir.1990).
[8] 343 So.2d 1166 (La.App. 3d Cir.), writ denied, 345 So.2d 904 (La.1977).
[9] 558 So.2d at 691.
[10] Melvin G. Dakin & Michael R. Klein, Eminent Domain in Louisiana, 181 (1976).
[1] Exxon v. LeBlanc, 99-1437 (La.App. 1st Cir.6/23/00), 763 So.2d 144; Exxon v. LeBlanc, 98-2058 (La.App. 1st Cir.6/23/00).
[2] In fact, this is precisely the situation in the other two cases referenced above.