763 So.2d 128 (2000)
EXXON PIPELINE CO.
v.
V. Price LeBLANC, Shirley Wolf LeBlanc and Simon Corporation of Louisiana.
No. 99 CA 1437.
Court of Appeal of Louisiana, First Circuit.
June 23, 2000.
Rehearing Denied July 31, 2000.
*130 Gary Bezet, James P. Doré, Robert E. Dille, Baton Rouge, Counsel for Plaintiff/Appellant Exxon Pipeline Company.
Patrick W. Pendley, Plaquemine, David Ellison, Baton Rouge, Counsel for Defendants/Appellees V. Price LeBlanc, Shirley Wolf LeBlanc and Simon Corporation of Louisiana.
*131 Before: SHORTESS, C.J., WHIPPLE, PARRO, FITZSIMMONS, and KUHN, JJ.
KUHN, J.
Plaintiff-appellant, Exxon Pipeline Company ("Exxon"), appeals a judgment in favor of defendants-appellees, landowners, V. Price and Shirley Wolf LeBlanc and Simon Corporation of Louisiana[1] (collectively "the LeBlancs"), awarding just compensation and attorney fees. As amended, we affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND
On March 11, 1998, Exxon filed a petition for expropriation averring entitlement to temporary and permanent servitudes for the construction and installation of three pipelines on defendants' property.[2] The LeBlancs filed an answer on April 6, 1998, denying the allegations of Exxon, challenging the need and necessity of the expropriation, the route selection, as well as the size of the parcels of land upon which the servitude was proposed to be situated. In the alternative, the LeBlancs claimed entitlement to the fair market value of the property taken and severance damages for the reduction of the fair market value of the remainder of their land.
In May 1997, the LeBlancs purchased approximately 418 acres of undeveloped land in Iberville Parish. Approximately six acres of the land purchased are located on the western side of Highway 30; the remaining approximate 412-acre tract is east of the highway. The parcels of land upon which Exxon seeks to locate the temporary construction servitude and the permanent servitude are totally contained within the 412-acre tract.
The permanent servitude encumbers two separate parcels of land within the 412-acre tract of land. The eastern-most parcel (Tract 1) is approximately 22.83 feet wide by 290 feet in length; the westerly tract (Tract 2) is 30 feet wide (at the widest part) by approximately 600 feet long. Both parcels are subject to numerous existing servitudes which allow the respective servitude owners to install inter alia power lines, pipelines and a fiber optic cable as set forth in their respective servitude agreements. Tract 1 is entirely encumbered by preexisting servitude agreements, while all but .285 of the .412 acres which comprise Tract 2 are encumbered.
The temporary servitude as proposed would encumber land totaling 4,096.33 feet in length. The width of the temporary servitude is 50 feet to the south of the land encumbered with the permanent pipeline servitude and 25 feet to the north of it. Much of the LeBlanc land Exxon seeks to utilize for the temporary construction servitude is contemplated for the construction and installation of the three pipelines on *132 land owned by adjoining landowners to the north.
On October 30, 1998, the trial court signed a judgment concluding that Exxon was a common carrier of petroleum products with the power to expropriate,[3] and awarding $125,904.14 as just compensation to the LeBlancs. The judgment reserved assessment of attorney fees for a later date. On November 16, 1998, Exxon filed a motion for new trial, which was granted to cure discrepancies in the property description. A judgment in conformity with the modifications, but otherwise reinstating the October 30, 1998 judgment, was signed on December 11, 1998.[4] Exxon lodged this devolutive appeal on January 11, 1999. After a hearing on a motion to tax costs filed by the LeBlancs, the trial court signed a judgment awarding a total of $54,380.00 in attorney fees.[5]
Exxon raises the following issues in this appeal:
(1) Whether the trial court erred in its determination of the fair market value of the property taken for a public use;
(2) Whether the trial court erred in its conclusion that defendants were entitled to severance damages under the facts of this case; and
(3) Whether the trial court erred in the amount it awarded for attorney fees;[6]

II. EXPROPRIATION
Expropriation of private property for public purposes is addressed in Article I, Section 4 of the Louisiana Constitution, providing in pertinent part:
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss.
Although Article I, Section 4 does not specify how to fully compensate a landowner *133 whose property is taken, it provides that the landowner should be compensated for "his loss" and not merely the loss of the land. State Through Dep't of Highways v. Constant, 369 So.2d 699, 701 (La. 1979).
Louisiana Revised Statutes 19:9 provides the following:
A. In estimating the value of the property to be expropriated, the basis of assessment shall be the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work.
B. The owner shall be compensated to the full extent of his loss....
The LeBlancs have not answered this appeal; therefore, the trial court's conclusions that Exxon is a common carrier entitled to expropriate and setting forth the sizes of the temporary and permanent servitudes and route selection are not in contention in this appeal.

III. JUST COMPENSATION
The owner is entitled to the market value of his or her expropriated property as "just compensation" for the taking. The market value approach examines the worth of the property in light of the highest, best, and most profitable use to which it may be reasonably put in the near future by reason of its location, topography, and adaptability. City of Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So.2d 445, 447 (La.1951), amended and affirmed, 223 La. 1079, 67 So.2d 732 (1953); State Through Dep't of Highways v. Rapier, 246 La. 150, 164 So.2d 280 (1964). In seeking to determine a highest and best use of property which would have an effect on the market value of the property at the time of expropriation in that it would be considered by a willing purchaser and is not remote or speculative, several factors may be considered, including, but not limited to: market demand, proximity to areas already developed in a manner compatible with the intended use, economic development in the area, specific plans of businesses and individuals, including action already taken to develop the land for that use, scarcity of land available for that use, negotiations with buyers interested in the property taken for a particular use, absence of offers to buy the property made by buyers who would put it to the use urged, and the use to which the property was being put at the time of the taking. See M. Dakin and M. Klein, Eminent Domain in Louisiana 171-72 (1970, Supp. 1978) (as cited in West Jefferson Levee District v. Coast Quality Constr. Corp., 93-1718, p. 18 (La.5/23/94), 640 So.2d 1258, 1274); State, Dep't of Transp. and Dev. v. Hammons, 550 So.2d 767, 771 (La.App. 2d Cir.1989); State, Dep't of Transp. and Dev. v. Boagni, 509 So.2d 471, 473 (La. App. 3d Cir.1987). Potential uses of the property must overcome a presumption in favor of the existing use. State, Dep't of Highways v. Rapier, 164 So.2d at 282.
The most reliable and approved method for determining the fair market value of immovable property is to consider comparable sales, adjusting them to compensate for their good and bad features with regard to the subject property. State, Dep't of Transp. and Dev. v. Mayet, 521 So.2d 671, 672 (La.App. 1st Cir.1988). Although the study of comparables is the primary tool of analysis, all of the tools of evaluation, including the determination of highest and best use, the study of comparables, cost of structure and depreciation studies, and income analysis, are only means to fixing just and adequate compensation; no one of the tools is an end in itself. If there is a priority attached to the study of comparables, it exists only because, in most cases, that approach is most likely to produce accurate results, insuring just and adequate compensation. When, however, the study of comparables does not, as a matter of fact, serve best to ensure an accurate evaluation, the prime consideration of just and adequate compensation requires that courts be free to *134 use any other method better suited to a correct assessment of value. State, Dep't of Highways v. Crow, 286 So.2d 353, 356 (La.1973). In an expropriation proceeding, the factfinder's factual determinations as to value of property and entitlement to any other types of damages will not be disturbed on review in the absence of manifest error. State through Dep't of Transp. and Dev. v. Estate of Davis, 572 So.2d 39, 45 (La.1990). The trial court is granted a great deal of discretion in determining the value of property in expropriation cases. See State, Dep't of Transp. & Dev. v. Mayet, 521 So.2d at 673. This discretion applies to any case where the value of real estate is at issue. Id.

A. VALUATION OF THE PROPERTY TAKEN

(THE PERMANENT SERVITUDE)

1. Expert Testimony
In its written reasons for judgment, the trial court awarded $56,626.50 to the Le-Blancs for the expropriation of their property. The LeBlancs' expert real estate appraiser, Oren Russell, defined the subject property as the right to install three additional pipelines. Noting that the appropriate legal "vehicle" to accomplish Exxon's objective in Louisiana is the predial servitude, Russell indicated that the parcels of land upon which Exxon desired to locate its servitude were already encumbered with various utility and pipeline rights of way. Exxon's expropriation did not seek to take additional land but rather the right to install three additional pipelines within already-encumbered parcels of land. In Russell's opinion, the highest and best use of the parcels of land upon which Exxon proposed to locate its servitude was as a pipeline/utility corridor. Based on his evaluation of more than 1,100 pipeline servitude acquisitions, which included both sales on the open market and those between property owners and entities granted the power of expropriation, Russell opined that the subject property was worth $350.00 per rod[7] per pipeline. His study of comparable sales of pipeline servitude acquisitions showed, among other things, transactions from $50.00 to $1,353.00 per rod, with landowners obtaining total sums ranging between $2,265.00 (for 45.30 rods at $50.00 each) for three pipelines to $614,604.00 (for 1,781.46 rods at $345.00 each) for a single pipeline. Russell's study included prices paid per rod for tracts of land affecting various widths, ranging from fifteen feet to seventy feet wide. Also contained in his study were notations of the number of pipelines the landowner had agreed to permit the pipeline company to install. Russell's ultimate conclusion was that the subject property was worth a total of $56,626.50 based on the total rodage Exxon desired to permanently expropriate.
Exxon's expert real estate appraiser, Jack Evans, opined the value of the permanently expropriated property was $1,561.00. In reaching his determination of the value of the expropriated property, Evans considered the 412 acres located east of Highway 30 as the parent tract and examined sales of tracts of land varying in size from two to twenty acres. Evans opined the highest and best use for one parcel of land for which Exxon proposed locating its permanent servitude was within the light industrial, commercial or speculative investment portion of the 412-acre parent tract; the other parcel of land was located in an area that had a highest and best use for residential purposes according to Evans. Based on his evaluation of the comparable sales of nearby tracts of land, Evans opined that per acre value the entire 412-acre parent tract was $4,000.00. He diminished the value of each of the two parcels by 80% each for encumbrances existing on the land which he could identify, and multiplied the total acreage affected *135 by the permanent taking to arrive at his opinion of the value of the expropriated property.

2. Reliability of Expert Testimony
Exxon urges that the trial court erred in fixing the value of the property taken by relying on the expert testimony of Russell and should have accepted the valuation testified to by Evans instead. In mounting its attack, Exxon suggests the trial court erred by allowing Russell to give his expert opinion on the valuation of the property Exxon desired to expropriate, and then further erred by relying on that expert's opinion of the highest and best use of the land upon which the property to be taken is situated, as well as the expert's selection of sales comparables to ascertain the market value of the property taken for public purposes.
Citing La. C.E. art. 702 (setting forth the general rule for the admissibility of expert testimony)[8] and the United States Supreme Court's holding in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993),[9] Exxon urges that Russell's expert opinion lacks the requisite basis in the knowledge and experience of his discipline.
In Exxon Pipeline Company v. Hill, 99-0073, pp. 7-15, 763 So.2d 144, 150-56 (also handed down this day), we examined the landowners' contention that exclusion of this same expert in another expropriation proceeding invoked by Exxon for permanent and temporary servitudes for the installation of the same three pipelines involved in the case sub judice was reversible error.
As we indicated in Hill, the United States Supreme Court stated in Kumho Tire Co., v. Carmichael, 526 U.S. 137, 148, 119 S.Ct. 1167, 1174, 1176, 143 L.Ed.2d 238 (1999), that the objective of Daubert's requirement that the trial court act as a gatekeeper is to ensure, through reliability and relevancy, that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in a relevant field. The Kumho court concluded that the general principles set forth in Daubert established a standard of evidentiary reliability which requires a valid connection to the pertinent inquiry as a precondition of admissibility. Thus, in Hill we found the trial court's application of the Daubert suggestions as a bright line rule of admissibility, and its ultimate conclusion that Russell's testimony was unreliable and therefore was excluded from evidence, constituted an abuse of discretion.
After an examination of Russell's proffered testimony in Hill, we determined that the method of valuation that Russell explained in his proffered testimony has a reliable basis in the knowledge and experience of real estate appraisal, i.e., "the underlying premise upon which Russell formulated his opinion of the value of the subject property was that in exercising the market approach, the comparable sales which should be examined by the appraiser were sales of pipeline acquisitions for rights of way." Hill, 99-0073 at p. 13, 763 So.2d at 154. Because the evidence in this record is essentially the same as it was in Hill insofar as the underlying premise of *136 Russell's expert testimony, for the reasons more fully explained therein, we find no error in the trial court's determination that the specialized knowledge upon which Russell formulated his opinion of the value of the property taken by Exxon was reliable, and thus, the real estate appraiser was qualified to testify as an expert.
Exxon claims that Russell's use of comparable sales of pipeline servitudes to value the expropriated property fails to consider the before and after valuation required to ascertain the full extent of the loss the owner has suffered so as to compensate him in accordance with La. Const. Art. 1, sec. 4. Having defined the subject property as the right to install three pipelines and stating his opinion is that the highest and best use of the subject property was as a pipeline/utility corridor, Russell explained that in a valuation of the LeBlancs' property before the taking and after the taking, the subject property would have been valued at $350 per rod per pipeline prior to the taking. Once the subject property has been taken, that same amount is deducted from the before value. Thus, subsequent to the taking, the subject property, having been transferred to Exxon, would have a value of $0. According to Russell, if it is reasonable and probable that utility companies, including pipelines, will be crossing an owner's property, it is appropriate to consider that pipeline/utility corridor value in the before valuation.
We find no error in the trial court's conclusion that Russell was qualified to testify on the value of the expropriated property as an expert real estate appraiser.

3. Highest and Best Use
Exxon maintains that the trial court's reliance on Russell's opinion to determine the highest and best use of the property taken was erroneous. The trial court concluded that the highest and best use of the property which Exxon sought to expropriate was as a pipeline or utility corridor.[10] By accepting Russell's testimony to arrive at the conclusion that the highest and best use of the expropriated property is as a pipeline/utility corridor, the trial court implicitly accepted the expert's description of what constituted the subject property.
Exxon contends it is impermissible to base the determination of just compensation on the enhanced value of the property taken, i.e., to consider the value in light of the purpose for which it was taken. Exxon suggests that finding the highest and best use of the expropriated property is as a pipeline/utility corridor and the use of comparable sales of pipeline acquisitions to ascertain the value of the property taken for public purposes necessarily considers the enhancement in value of the property taken and, therefore, is erroneous.
Exxon's assertion misses its mark by failing to consider the status quo of the land in the immediate vicinity of the property which it chose to expropriate. The testimonial and documentary evidence abundantly demonstrates that the land surrounding the subject property, as well as the parcels of land upon which Exxon has sought the right of way to install three additional pipelines, were already encumbered with numerous pipeline and utility servitudes prior to Exxon's decision to expropriate this property. It is the existence of the prior pipelines and/or utilities which gives the subject property the qualities *137 that allow it to be considered a pipeline or utility corridor. Any enhancement which occurred was the result of the presence of the earlier pipeline and/or utility and is not from the expropriation of the subject property.
Citing several cases decided by the Third Circuit Court of Appeal, Exxon urges this court should limit valuation of the expropriated property to instances where there are no comparable land value transactions. Urging that Gulf States Utilities Co. v. Norman, 183 So.2d 421 (La.App. 3d Cir.), writs denied, 249 La. 118, 120, 185 So.2d 529 (1966), requires a lack of sufficient comparable land value sales before reliance on comparable sales of pipeline acquisitions may be resorted to by a trier of fact, Exxon asserts the trial court's valuation of the property taken is erroneous.
By concluding the highest and best use of the property sought to be expropriated by Exxon was as a pipeline/utility corridor, the trial court undisputedly accepted the testimony of expert real estate appraiser Russell. We note that La. R.S. 19:1 includes servitudes within its definition of "property" which may be expropriated. An examination of the Third Circuit cases cited by Exxon shows that none include a discussion or indication that the subject property was limited to the right to install additional utilities. In other words, each case involved the acquisition of additional parcels of land, as well as the right to install the pipeline or otherwise lay the utility at issue. In Michigan Wisconsin Pipeline v. Fruge, 227 So.2d 606 (La.App. 3d Cir.1969), writs denied, 227 So.2d 615, 616 (La.1970), the servitude was to allow for a pipeline to be constructed parallel to and 25 feet from an existing pipeline. Plaintiff therein sought to expropriate a permanent servitude 50 feet in width. The Fruge court neither indicates the width of the preexisting pipeline servitude nor whether the expropriated property is within the same parcel of land as the earlier pipeline servitude. While the court indicated that the properties involved in Louisiana Intrastate Gas v. Edwards, 343 So.2d 1166 (La.App. 3d Cir.), writ denied, 345 So.2d 904 (La.1977) were traversed by seven existing pipelines, it did not indicate whether the additional parcels of land which were expropriated were within the preexisting pipeline servitudes. The subject property at issue in Columbia Gulf Transmission Co. v. Rosteet, 389 So.2d 778 (La.App. 3d Cir.), writ denied, 394 So.2d 617 (La.1980), was the perpetuation of a right of way whose twenty-five year term had elapsed; the plaintiff utility company sought simply to renew its preexisting servitude, without adding additional utilities. Louisiana Resources Co. v. Greene, 406 So.2d 1360 (La.App. 3d Cir.1981), writ denied, 412 So.2d 84 (La.1982), fails to denote whether the subject property includes the permanent taking of additional land. Thus, we conclude none of these cases clearly examines subject property with the same limitations, i.e., a servitude for the right to install three new pipelines (utilities) without the taking of additional land.
In Norman, 183 So.2d at 425, the Third Circuit held that in absence of truly comparable sales, the determination of market value of the property in question required consideration of pipeline servitude transactions, which in accumulation represented a series of transactions with different purchasers and prices and which were the result of arms length bargaining even though the prices were to some extent influenced by need of grantees to acquire the servitudes. Because the trial court in the case sub judice determined the subject property to be the servitude which allows for the installation of three additional pipelines upon land already burdened with preexisting servitudes, the comparable sales of land are not truly comparable.[11] *138 Based on the assertions presented by Exxon in this appeal, we find no error in the trial court's conclusion that the highest and best use of the subject property permanently taken from the LeBlancs for public purposes is as a pipeline/utility corridor.[12]

4. Value of Property Expropriated vs. Value of Land in Acreage
Exxon suggests that to award compensation for the servitude taken, a sum of money based on the number of rods (i.e., on a "per rod basis") rather than the number of acres (i.e., on "a per acre basis") has the effect of granting the property owner an amount of just compensation greater than complete transfer of title in full ownership of the property would allow. Exxon's position ignores accepted appraisal techniques and those which have customarily been applied by the court. See e.g., State Through Dep't of Highways v. Rapier, 164 So.2d at 280; Pointe Coupee Elec. Membership Corp. v. Mounger, 447 So.2d 1104, 1109-10 (La.App. 1st Cir.1984) (establishing that value is determined after a conclusion of the highest and best use of property).
It is well accepted that the market approach customarily used by appraisers requires the determination of highest and best use of the property being taken. Exxon's position ignores the proposition that in this case, the trial court determined that the highest and best use of this property is as a "pipeline corridor." Therefore, if such a conclusion is not manifestly erroneous, based on our standards of review, it must be accepted by this court.
Once the highest and best use is determined, under La. Const. Art. I, sec. 4, it is the obligation of the court to value the property expropriated, here a servitude over a pipeline corridor, to arrive at a sum of money to fully compensate the property owner to the full extent of his loss. Consequently, it is of no moment that the adjacent property may have a highest and best use as a subdivision or a shopping center. The question before the court is what is the value of the property which has been expropriated when a reasonable factual basis exists to support the determination that the property has a highest and best use a pipeline/utility corridor. Based on the undisputed evidence in this record, that within the pipeline industry the standard measurement of the valuation of pipeline servitudes on the open market is on a per rod basis, it is, therefore, appropriate to use the "per rod basis" rather than an acreage basis. To do otherwise ignores well accepted principles of determination of highest and best use. Furthermore, it ignores the potential that a large tract of land may have different portions of property with different values based on different determinations of highest and best use.
In the case before us, the highest and best use for different portions of the land *139 owned by defendants is different. This is because the servitude expropriated has a different highest and best use (pipeline corridor) than the larger, undeveloped remainder of the property. The evidence relied upon by the trial court recognizes these facts. Consequently, the large tract remaining may have a lower value (per acre) than the expropriated servitude (per rod). Nevertheless, it is not the remainder of the tract of land owned by defendants which has been expropriated by Exxon; the subject property, with a highest and best use as a pipeline/utility corridor, is a servitude in the form of the right to install additional pipelines into a narrow strip of land. This strip of land, a pipeline/utility corridor, is measured by rod rather than by acre, which is a well accepted pipeline industry technique of measurement and determination of value. Although Exxon would have us isolate our review of the trier of fact's factual conclusion to simply examine the use of the per rod measurement, we do not review facts in a vacuum. The question properly before us is whether, taking all the evidence relative to measurement and valuation of the pipeline servitude expropriated, the record as whole reveals a reasonable factual basis to support the appraisal technique determined by the trier of fact to apply. Because it does, the constraints of our standard of review mandate acceptance of the technique.

5. Selection of Comparable Sales of Pipeline Acquisitions
Exxon challenges the selected comparable sales of pipeline acquisitions actually used by Russell to determine the value of the expropriated property. Specifically, Exxon complains that consideration of comparable sales of pipeline acquisitions between willing property owners and willing pipeline companies which lack the power of expropriation is error.
In ANR Pipeline Co. v. Succession of Bailey, 558 So.2d 689, 691 (La.App. 1st Cir.1990), this court noted the connexity between the use of transactions of sales of inter alia servitudes on the open market and the determination of just compensation. While the ANR Pipeline Co. court concluded the trial court had not abused its discretion under the facts of that case by considering transactions between landowners and pipeline companies with the right to expropriate in its determination of the value of a pipeline servitude, it pointed out that such transactions were not "the best evidence of the fair market value because they are not representative of an open market." Id. Exxon's assertion is misplaced. It is precisely the sales between willing buyers and willing sellers which duly reflect the market value of any property.
As noted supra the factfinder's factual determination as to value of property will not be disturbed on review in the absence of manifest error. State through Dep't of Transp. and Dev. v. Estate of Davis, 572 So.2d at 45. Based on the scope of Russell's study, the perimeters of which were outlined supra, we cannot say that the trial court's valuation of this servitude expropriated from the LeBlancs, which allows for the installation of three additional Exxon pipelines, in a total amount of $56,626.50 lacks an evidentiary basis. Accordingly, the trial court's determination that the fair market value of the permanent pipeline servitude taken by Exxon for public purposes was $350 per rod per pipeline is not erroneous.[13]

*140 B. VALUATION OF TEMPORARY SERVITUDE
Exxon contends that the only evidence of the value of the temporary construction servitude was the testimony of its expert real estate appraiser, Evans, who opined the 4,096.33 feet (length) by 25 feet (width) area which would be occupied by Exxon for approximately six months to construct and install the three pipelines on the land of the LeBlancs' neighbor to the north was worth a total of $783.00. Exxon suggests that the trial court's valuation was based solely on the LeBlancs' assertion that $25.00/rod was the amount Exxon "uniformly and voluntarily" paid to others whose property has been taken by Exxon for public purposes.
Among the numerous exhibits contained in this record is the report of Oren Russell which estimates the value of the temporary servitude to be $25.00/ rod, based on the expert's examination of acquisitions between Exxon and Longwood Plantation, Ltd., John Prewitt Nelson, et al. and Steinbach, L.L.C. Calculating the total area encumbered by the temporary servitude to be 284.01 rods, Russell's report states that $7,100.00 reflects the market value of the temporary construction servitude. In light of the information contained within Russell's report, we find a reasonable factual basis exists to support the trial court's award of $7,100.00 to the LeBlancs for the temporary construction servitude. While the relied upon transactions cited by Russell in his report relate to acquisitions of property for the installation of these same three pipelines by Exxon, consideration of transactions between landowners and pipeline companies with the right to expropriate was appropriate under the facts of ANR Pipeline Co. v. Succession of Bailey, 558 So.2d at 691, in its determination of the value of a pipeline servitude. We, likewise, find no error in the valuation of the temporary construction servitude by the trial court under the facts presently before us.

C. SEVERANCE DAMAGES
Wayne Kermit Williams, an expert real estate appraiser, testified that the LeBlancs incurred severance damages. Based on his conclusion that the 412-acre tract east of Highway 30 had three distinctive highest and best uses, Williams calculated total severance damages in the amount of $60,975.00.[14] Apparently relying on this expert testimony, the trial court awarded the LeBlancs severance damages.[15]
*141 Exxon asserts that the trial court's award of severance damages in addition to the valuation of the expropriated property for pipeline uses is erroneous. Contending that the trial court utilized one expert appraiser's method for determining the value of the part taken and another appraiser's method to determine the amount of severance damages incurred as a result of the taking, Exxon urges that neither appraiser testified that the combination of their separate opinions constitutes the total amount of just compensation owed.
Russell narrowly defined the subject property as the right to install three pipelines, and limited his valuation to the subject property and the temporary construction servitude, offering no suggestions regarding the value of or damage to the remainder of the 412-acre tract of land. In contrast, Williams, who did not value the part taken, opined that the Le-Blancs' 412-acre tract of land had three highest and best uses. In addition to commercial and residential highest and best uses of various areas within the 412-acre tract, Williams concluded the lowest per acre value was borne by that area already encumbered with utility and pipeline servitudes.
We find that because the trial court concluded the highest and best use of the expropriated property was as a pipeline/utility corridor, it necessarily accepted Russell's narrow definition of the subject property as the pipeline servitude. Russell explained that the presence of a utility or pipeline in and of itself gave the underlying tract of land the necessary characteristics to be considered a pipeline/utility corridor. The evidence establishes that at the time the LeBlancs acquired the land upon which Exxon seeks to expropriate the pipeline servitude, it was already burdened with multiple pipelines and other utility servitudes. The expropriation of this pipeline servitude, i.e., the right to install three pipelines, by Exxon from the LeBlancs has done nothing to change the highest and best use of the underlying land or any characteristic of the remaining land. As such, the trial court's award of severance damages is clearly wrong under the facts of this case. Lacking a reasonable evidentiary basis, the severance damage award is vacated.[16]

*142 IV. ATTORNEY FEES
The trial court determined the LeBlancs were entitled to attorney fees, which were taxed as costs, and awarded $36,646.00 to one attorney and $17,734.00 to a second attorney (who assisted in trial preparation) for a total attorney fees in the amount of $54,380.00.
Initially, we note that while the December 11, 1998 judgment which Exxon appealed recognized that the LeBlancs were entitled to an assessment of attorney fees, the amount was not awarded until March 22, 1999. Exxon did not appeal that judgment and therefore the propriety of the award of attorney fees is not technically before us in this appeal. See Thibaut v. Thibaut, 607 So.2d 587, 609-10. However, because we have significantly reduced the overall amount of just compensation awarded to the LeBlancs, in order to avoid an inequity, we exercise our supervisory jurisdiction. See La. C.C.P. art. 2201.
Louisiana Revised Statutes 19:8(A) states in relevant part:
Immediately after compensation has been determined, the plaintiff shall, upon motion of the defendant, present evidence as to the highest amount it offered the defendant for the property prior to trial on the merits. After hearing evidence on the issue, the court shall determine the highest amount offered. If the highest amount offered is less than the compensation awarded, the court may award reasonable attorney fees.
Regardless of the language of the statutory authorization for an award of attorney fees or the method employed by a trial court in making an award of attorney fees, courts may inquire as to the reasonableness of attorney fees as part of their prevailing, inherent authority to regulate the practice of law. Factors to be taken into consideration in determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances involved; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge. Rivet v. State, Dep't of Transp. and Dev., 96-0145, pp. 11-12 (La.9/5/96), 680 So.2d 1154, 1161.
Evidence admitted at the trial on the merits indicated that Exxon's last offer to the LeBlancs for the expropriation of both the temporary and permanent servitudes was $225 per rod. On appeal, we have affirmed the trial court's award $350 per rod per pipeline, or $56,626.50, for the permanent servitude and its $7,100.00 award for the temporary servitude, for a total award of $63,726.50 which is significantly more than Exxon offered. We have also concluded the remainder of the award, for severance damages, was error under the facts of this case and have vacated that portion of the just compensation granted to the LeBlancs. Nevertheless, because the amount of just compensation for the property taken exceeds the last amount offered by Exxon, the LeBlancs are entitled to attorney fees. Based on the evidence submitted at the hearing to tax costs filed by the LeBlancs, and mindful of the criteria set forth in Rivet, we conclude the amount of $21,200.00 constitutes reasonable attorney fees in this case.

V. CONCLUSION
For the reasons stated herein, the judgment awarding just compensation in the amount of $125,904.14 is amended to award total just compensation in the amount of $63,726.50, i.e., $56,626.50 for the permanent servitude and $7,100.00 for the temporary construction servitude. The award of attorney fees in the total amount of $54,380 .00 is amended to an award of $21,200.00. In all other respects the December 11, 1998, and the March 22, 1999 judgments are affirmed. Costs of *143 this appeal in the amount of $3,217.60 are assessed to Exxon.
AMENDED AND, AS AMENDED, AFFIRMED.
SHORTESS, C.J., concurs with reasons.
WHIPPLE, J., concurs for reasons assigned by SHORTESS, C.J.
FITZSIMMONS and PARRO, JJ., dissent, and assign reasons.
SHORTESS, C.J., Concurring.
I agree with the result here for the reasons set forth in my concurrence in Number 99 CA 0073, Exxon Pipeline v. Hill, also decided this date. I note here that the trial court found the highest and best use was for a pipeline corridor.
I respectfully concur.
FITZSIMMONS, Judge, dissenting, with reasons.
The issue is not what measure of land should be used for valuation, acre or rod, but what comparables should be averaged. The per acre comparables accessed should be for the reasonably anticipated highest and best use of the property at the time of expropriation. The per rod comparables, however, appear to show the value of the property as impacted by the expropriation itself.
The expropriated use here is a so-called "pipeline corridor." The difference in valuation can perhaps be better understood by considering the expropriation of land for the interstate system, a "car corridor." Arguably, preservationists view the interstate system through cities as a negative impact, which is sometimes the case. From an economic viewpoint, the construction of a super highway through a city often improves the value of blighted or under utilized property. The appraised value of the highest and best use of the property expropriated for a highway does not include the value after the expropriation or the value the property will have as a result of the changes caused by the expropriation. In these pipeline cases, the per rod comparables are primarily based on the value of the property as impacted by the expropriation, that is, the highest and best use is said to be as a "pipeline corridor."
The impact of the future expropriated use on the value of the land should not be taken into account. To do so will raise the value of all expropriated lands to such a level that many necessary public, or public use, projects will be too costly, even for governments. The power of expropriation is given because the project is for the public good. If the Exxon pipeline does not sufficiently benefit the public, the answer is to remove the power of expropriation, not allow the values to be manipulated. Once the argument can be made that the property should be valued based on its future expropriated use or value after expropriation, be it pipelines or land fronting interstate systems or improved highways, the Pandora's box of abnormally escalating values will be opened. For these reasons, I respectfully dissent.
PARRO, J., dissenting.
The majority opinion seemingly stands for the proposition that a virgin piece of property has a lesser value than one that has been raped. I do not subscribe to this proposition.
I disagree that the value of the property expropriated in this case (and the companion cases also decided this date[1]) is to be determined by comparing negotiated sales of pipeline servitudes on a "per-rod" basis, rather than by considering the "per-acre" fair market value of the property upon which the servitude is imposed. Article I, Section 4 of the Louisiana Constitution states that when property is expropriated, "the owner shall be compensated to the full extent of his loss." The purpose of the *144 property valuation procedure is to determine the loss to the landowners, not the value of the servitude to the pipeline company. The use of negotiated "per-rod" sales as comparables in these cases results in these property owners being paid many times more for the transfer of a servitude than they would receive for a transfer in full ownership of the property subject to the servitude. This valuation ignores the constitutional mandate. It is logically inconsistent to conclude that property owners lose more when a servitude is taken, leaving them with full or partial use of the surface of the land, than they would if full ownership of the property were being transferred.
Additionally, under the method of valuation endorsed by the majority, the property owners in this case are being compensated for the same "loss" more than once, as the servitudes being expropriated simply add pipelines to property already encumbered with existing pipeline or utility servitudes. Instead of deducting some proportionate amount in recognition that the owners have already been compensated for the partial loss of use of their property to a servitude, this method of valuation uses the existing pipeline/utility servitudes to justify an even higher price in subsequent expropriations.
Private entities authorized by law to expropriate may do so only for a public and necessary purpose. Expropriation exists in our Constitution because the public recognizes that some private property rights must give way for the public good, provided the private property owner is fully and fairly compensated for his loss. The radically new valuation method approved by the majority in these cases will add incalculable costs to the public when these expenses are passed on in the prices of oil, natural gas, electricity, water, and other utilities. Thus, the public will suffer, while a few property owners will reap a windfall, simply because they fortuitously own property within the shortest and most efficient routes for the transport of these necessities. The benefits of expropriation intended for the public good will be severely curtailed by this valuation approach.
I would reverse the trial court and render a judgment awarding the landowners the fair market value of the servitudes, using the "per-acre" value of the encumbered land, as estimated by the experts in this case, and deducting a percentage to reflect the diminished value of the property due to the previous servitudes.
For these reasons, I respectfully dissent.
NOTES
[1] The evidence adduced at trial showed that Gordon LeBlanc, who is the brother of V. Price, and Gordon's children are owners of the Simon Corporation of Louisiana.
[2] The expropriation of the permanent and temporary servitudes at issue in the case sub judice was part of Exxon's "SOLA" pipeline project, which was the subject of the companion cases Exxon Pipeline Co. v. LeBlanc, 98-2058 (La.App. 1st Cir.6/23/00) (an unpublished opinion) and Exxon Pipeline Co. v. Hill, 99-0073 (La.App. 1st Cir.6/23/00), 763 So.2d 144, also handed down this day. The record establishes that the first pipeline was designed to have an outer dimension of 24 inches and was to be constructed for the purpose of transportation of petroleum products to and from the Exxon Pump Station in St. James and the Anchorage Terminal in Port Allen; the second pipeline was designed to have an outer dimension of 12.75 inches and was to be constructed for the purpose of transportation of petroleum products to and from the Exxon Bundle Crossing in West Baton Rouge Parish and the Sorrento Storage Dome in Ascension Parish; the third pipeline was designed to also have an outer dimension of 12.75 inches and was to be constructed for the purpose of transportation of petroleum products to and from the Anchorage Chemical Terminal in West Baton Rouge Parish and the Sorrento Storage Dome in Ascension Parish and the Shell Geismar facility also located in Ascension Parish.
[3] See La. R.S. 19:2(8) and La. R.S. 45:251.
[4] On January 6, 1999, on its own motion, the trial court issued a judgment entitled "SECOND AMENDED JUDGMENT." A cursory comparison of the judgment issued on December 11, 1998, and the January 6, 1999 judgment shows that the amount of just compensation was modified in the later-dated judgment to $124,663.75. Although La. C.C.P. art. 1951 provides that a final judgment may be amended by the trial court at any time on its own motion to correct errors of calculation, the December 11, 1999 judgment sets forth only a single amount of $125,904.14, without an allocation of amounts for the value of the property taken and/or severance damages. At the same time the trial court issued the January 6, 1999 judgment, it also filed written reasons for judgment allocating a total of $63,689.25 for the fair market value of the property taken and $60,975.00 for severance damages, which amounts to $124,663.75. Because the December 11, 1998 judgment lacks an allocation of the various items of the total just compensation award, it is impossible for a reviewing court to ascertain whether an error in calculation occurred or whether the alteration constitutes a substantive modification. We note that Exxon has appealed the December 11, 1998 judgment and the LeBlancs have asserted no contentions challenging the propriety of this appeal. Thus, it is the December 11, 1998 judgment which we review in this appeal.
[5] The March 22, 1999 judgment, entitled "AMENDED JUDGMENT," was issued to cure an error in calculation contained in an earlier judgment signed on February 11, 1999.
[6] Although Exxon purports to specify as error the trial court's award of expert witness costs (along with the awards for attorney fees), because it raises no contentions in its appellate brief challenging the amount awarded, we consider it as abandoned. See La. Uniform RulesCourts of Appeal, Rule 2-12.4.
[7] It is undisputed that pipeline companies negotiate pipeline servitude acquisitions in terms of an amount per rod. The evidence shows that a "rod" consists of a linear measurement, void of width, and which is 16.5 feet in length.
[8] Louisiana Code Evidence article 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
[9] According to Daubert, a court is required to act as a gatekeeper and fulfills this role by ascertaining whether or not the technique had been subjected to peer review and/or publication, the known or potential rate of error, the existence of standards controlling the technique's operation, the technique's refutability or, more simply put, testability, and, finally, an incorporation of the earlier jurisprudential rule of general acceptance in the scientific community as but one factor in the analysis. 509 U.S. at 590, 113 S.Ct. at 2797.
[10] As we noted in Hill, 99-0073 at p. 12 n. 10, 763 So.2d 153 n. 10, the evidence established that the pipeline industry utilizes "corridor" as a term of art, referring to instances where a pipeline servitude consists of an enormous number of rods on but a single landowner's tract of land. The landowner typically has standard rates and permits use of the corridor by any party willing to pay the fee. In this case, Russell explained that his reference to a "utility corridor," which encompasses pipelines as well as other types of utilities, was to a narrow strip of land which is encumbered by at least one utility or pipeline.
[11] The only land which Exxon's permanent servitude affected which is not already encumbered by a preexisting utility of some sort is 0.285 acres. We find the permanent taking of the 0.285 acres (in Tract 2) which were not already encumbered by a preexisting servitude to be of no moment. The demonstrative evidence shows that this 0.285 acres is located within and between existing rights of way owned by various pipeline companies. We find no error in the trial court's implicit rejection that the highest and best use of the 0.285-acre tract would be for residential purposes, as testified to by both Evans and Wayne Kermit Williams in his appraisal of severance damages. Clearly, the acreage would not be sufficient in size to permit a home to be constructed upon it assuming that the preexisting servitude agreements would not otherwise preclude such a construction. Because the only other evidence of highest and best use relative to the 0.285 acres was as a pipeline/utility corridor, the trial court's inclusion of the unencumbered land within the valuation of the pipeline servitude based on comparable sales of pipeline acquisitions is not wrong under the facts of this case.
[12] During the trial on the merits, Exxon representative, Paul Saltaformaggio alluded to permit requirements which make it necessary for a pipeline company to locate its lines within or adjacent to preexisting pipelines. Exxon has not asserted any state or federal laws which would mandate the placement of pipelines in a predetermined route, and we have therefore presumed for purposes of this appeal that any applicable permitting regulations addressing the placement of proposed new pipelines within the same or adjacent to preexisting servitudes is ultimately within the discretion of the expropriating entity.
[13] We recognize that in the companion case, Exxon Pipeline Co. v. Hill, 99-0073 at p. 16, 763 So.2d at 156-57, also rendered this day, on our de novo review of the evidence, in our posture as trier of fact, we awarded the landowners the amount of $250.00 per rod per pipeline for the expropriation of the permanent servitude, while in this appeal we find no error with the award of $350.00 per rod per pipeline granted by the trial court. The difference in the per rod valuation between these companion cases is simply a result of the standard of review this court is bound to apply. In the case sub judice, as trier of fact, the trial court concluded $350.00 per rod per pipeline was an appropriate amount to award. On appellate review, a reasonable factual basis exists to support the trial court's valuation of the pipeline servitude; therefore, it is not manifestly erroneous. See State through Dep't of Transp. and Dev. v. Estate of Davis, 572 So.2d at 45. Although had we been trier of fact we may have concluded a lesser amount was more appropriate, because the evidence revealed that the amount of $350.00 per rod per pipeline awarded was within the range pipeline companies have paid on the open market to landowners willing to sell rights of way for servitude use, we cannot say the trial court, sitting as trier of fact, abused its vast discretion in awarding the more generous amount of $350.00 per rod per pipeline. See State, Dep't of Transp. & Dev. v. Mayet, 521 So.2d at 673.
[14] Williams derived the value of $60,975.00 by suggesting the highest and best use of the land located along Highway 30, which he referred to as the front of the LeBlanc 412-acre tract, as commercial and assessing a per acre value of $25,000.00. Testifying that a strip or belt of land surrounding the location of pipelines, including those located on an adjacent landowner's property, devalued all the land in a 250 foot proximity from the pipelines by 15%, Williams suggested that 10.86 acres would lose $40,725.00 in value. Indicating the value of the rear portion of the 412-acre tract of land had a highest and best use for residential purposes, Williams opined the value of 12.64 acres, within the 250 foot belt, would lose 30% or $18,960.00 from the $5,000.00 per acre. Testifying that the third area of land affected by the pipeline, already located within preexisting servitudes, was worth $1250.00 per acre because of the impact of the preexisting utilities, Williams stated the loss of value in this land was $1,290.00.
[15] See n. 4, supra.
[16] Exxon has assigned as error the trial court's limitation of the accessory right of ingress and egress from the public roads and/or terminal ends of the servitude granted. It asserts that as established by the trial court, Exxon will have to travel over property belonging to others in order to perform operational, repair and maintenance work on the pipelines. Rights which are necessary for the use of a servitude are acquired at the time the servitude is established and are to be exercised in a way least inconvenient for the servient estate. La. C.C. art. 743. In this case, the LeBlancs' land which is encumbered by the pipeline servitude is the servient estate. See La. C.C. arts. 646, 650 and 651. To install the three pipelines, Exxon will have obtained rights of way from each of the property owners along the route selected for the pipelines to run. Thus, Exxon will be the owner of the property adjacent to each parcel of the LeBlancs' land affected by the permanent pipeline servitude. In other words, Exxon will be the owner of the dominant estates which surround the permanent rights of way on the LeBlancs' tract of land. Therefore, the limitation of the right of ingress and egress as determined by the trial court will not have "the direct effect of imposing a burden on property of persons not [in this lawsuit]," as Exxon maintains. The trial court determined that limitation of the right of ingress and egress from the public roads and/or the terminal ends was least inconvenient to the servient estate, and that finding is clearly borne out by the demonstrative and testimonial evidence. Accordingly, we find no error.

Exxon also challenges the inclusion of an indemnity provision holding the LeBlancs harmless from any loss or liability arising out of, or in connection with, the pipeline. The indemnity provision also includes reimbursement of all costs and attorney fees in the event suit is filed. Many of the written servitude agreements introduced into evidence, including some executed with Exxon, contain a similar indemnity provision. Except for the reimbursement of costs and attorney fees, the indemnity provision operates in favor of the LeBlancs as a matter of law. We conclude that the inclusion of such a provision is duly within the scope of the trial court's consideration in an expropriation proceeding and find no error.
[1] Exxon v. Hill, 99-0073 (La.App. 1st Cir.6/23/00), 763 So.2d 144; Exxon v. LeBlanc, 98-2058 (La.App. 1st Cir.6/23/00).